People of the State of Illinois ex rel. Birch E. Morgan, Petitioner-Appellee, v. Wallace M. Mulliken, Respondent-Appellant.

Gen. No. 10,425.

Third District.

May 20, 1963.

Thomas, Mulliken & Mamer, and Wallace M. Mulliken, of Champaign (Maureen M. McCord, of counsel), for appellant.

Robert J. Waaler, State's Attorney, Champaign County Court House, of Urbana (Jack Waaler and Andrew Stecyk, Assistant State's Attorney, of counsel), for appellee.

ROETH, JUSTICE.

This appeal is prosecuted by Wallace M. Mulliken, an attorney, from a judgment of the Circuit Court of Champaign County which found him guilty of contempt and fined him $50 for his refusal to comply with an order of court directing him to turn over a certain written document to opposing counsel for their inspection during the trial of a case.

The events giving rise to the contempt order occurred during the trial of two cases which had been consolidated for trial entitled Juanita H. Wright, Individually and as Administrator of the Estate of David G. Wright, and John P. McMillan, Individually and as Administrator of the Estate of John S. McMillan v. John Joseph Royse et al. A report of proceedings as to what actually occurred in open court upon the trial of these cases in connection with the subject matter of the contempt order is incorporated in the record on appeal. We therefore look to the report of proceedings rather than the contempt order to determine whether the contempt order was correct. People v. White, 8 Ill App2d 428, 131 NE2d 803.

The record before us discloses that Chester Payne and the two deceased young men were passengers in an automobile being driven by the defendant John Joseph Royse at a time when it became involved in an occurrence in which the two deceased young men

lost their lives. Apparently the four young men had been in a tavern drinking prior to the occurrence and the question of the intoxication of the driver Royse was an issue in the case. Charles Payne was called as a witness for the plaintiffs. On cross-examination of Payne by Wallace M. Mulliken the following appears in the report of proceedings:

"Q. Now, Mr. Payne, you stated on your direct examination that you did not think Royse was intoxicated at the time you left Pembroke's tavern?

A. I do not.

Q. And to drive back?

A. That's right.

Q. Now, have you changed your opinion since you testified at the Coroner's inquest?

A. No, I haven't.

Q. Do you remember at one time having an opinion about Royse that he was completely sober—was not completely sober? He couldn't thread a needle, but he could hit a nail?

Mr. Hendrix: I'll object, Your Honor.

A. I don't believe I made a statement like that.

Q. You don't think you made such a statement?

Mr. Franklin: Do you represent that he did, Mr. Mulliken?

Mr. Mulliken: Yes I do.

Mr. Franklin: In the Coroner's inquest?

Mr. Mulliken: Not in the Coroner's inquest. In another statement.

Mr. Franklin: How big a nail?

Mr. Mulliken: Well, Mr. Payne didn't say.

Q. Mr. Payne, you had an interview with Mr. Joseph Luig at your home on or about April 26th, 1961?

A. Yes sir.

Q. Do you recall that interview?

A. Yes.

Q. And do you recall Mr. Luig asked you some questions about the condition of Royse at the time you left Mr. Pembroke's tavern and started back to Champaign?

A. Yes. And I believe I told him it was the same opinion I had stated in the Coroner's inquest.

Q. Do you remember making a statement to this effect, that Royse wasn't completely sober, and that he couldn't thread a needle, but he could hit a nail?

A. No I do not.

Q. Would you say you did not say this at that time?

A. No. I don't remember saying it.

Q. You don't know whether you said it or didn't say it?

A. No.

Q. Well, is it true that that is a fair description of Royse's condition at the time he left the tavern and got in the car to drive back?

A. Yes.

Mr. Franklin: I don't suppose he saw either one.

A. But I didn't have a needle to see if he could thread it or not.

Q. In your opinion was Mr. Royse capable of driving?

A. Yes he was."

The cross-examination then proceeded on other matters not material to the issue before us. On redirect examination by counsel for plaintiffs the following is reflected in the report of proceedings:

285

"Mr. Zimmerly: May we see the statement you allege Mr. Luig took, please, on which you cross-examined him?

Mr. Franklin: We request that Mr. Mulliken submit to us for examination the statement which he used to cross-examine and attempted to impeach this witness with in which he says that Mr. Payne has said, he couldn't—'I couldn't,' or 'I don't think he could thread a needle, but he could hit a nail,' or words to that effect. I think we have a right to see the statement that he uses for impeachment purposes.

Mr. Mulliken: We object to producing it, Your Honor, because it was a statement prepared at the direction of the attorney in preparation for trial, and is therefore a privileged document. It is a part of the things we used in preparing for trial, and under the Supreme Court rules is not the subject of discovery.

Mr. Franklin: It loses all privilege once they use it—.

The Court: The Court rules since you have used the document you should produce it for inspection.

Mr. Mulliken: Your Honor, I refuse to do this. And I will call Mr. Luig as a witness to impeach this witness. Mr. Luig is present, and he can be produced as a witness.

Mr. Franklin: I make a motion that Mr. Mulliken be held in contempt of Court if he refuses to obey the Court's order.

The Court: Will you take out the jury, Mr. Bailiff?

(Whereupon the jury retired to the jury room, and the following proceedings were had in open court, out of the presence of the jury:)

The Court: Mr. Mulliken, I am perfectly aware of your rule 19.5, concerning work products. I don't think this statement is a work product. Mr. Justice Solfisburg, in the last advanced sheet, specifically ruled such a statement is not a work product. And I am going to order you to deliver this statement to these attorneys.

Mr. Mulliken: Very well, Your Honor. I may have to suffer the same thing Duke Roney did which is a contempt of Court citation. I would like to see Mr. Justice Solfisburg's opinion.

The Court: All right. You can see Mr. Justice Solfisburg's opinion.

> (Thereupon Mr. Mulliken was furnished with, and read the opinion here referred to.)

Mr. Mulliken: Well, I may be. The Judge may throw me in jail, and we may have to stop the trial and get another attorney. We do have a right to prepare our cases, and we do have the right to protect our work products when we do prepare our cases. Your Honor, in this opinion of Mr. Justice Solfisburg's, they had a transcribed statement of one of the Defendants, which was a matter in controversy at that time. And it says in the opinion, 'In the case at bar the transcribed statement of one of the Defendants, when properly authenticated, would be independently admissible as an admission of a party, and might be introduced as part of the Plaintiff's case. True, this transcript was material evidence. We will concede that the ingenuity of counsel may have been responsible for finding the Defendant, obtaining a stenographer, and posing questions. But the material evidentiary matters are the admissions of the Defendant, and the mere transcription of these admissions does not bring them

287

within the privileges of rule 19.5.1.' Now, this man is not a party. And he cannot make an admission that is binding on a party in this case.

The Court: I concede that, that it can't be an admission. It is an impeaching statement. You can use that statement for impeachment purposes. And apparently you intend to use it. I don't know.

Mr. Mulliken: We intend to put a witness on the stand who will testify that he interviewed Mr. Payne and Mr. Payne made this inconsistent statement, with his testimony in chief.

The Court: All right. You are going to have to use that statement, are you not?

Mr. Mulliken: No, we are not going to use a written statement. He didn't sign anything. We don't have a signed statement.

The Court: Well, this man made some notes, and he is going to depend on this statement as to what this man said?

Mr. Mulliken: This man is going to testify from his own independent knowledge, and he may use a memorandum to refresh his recollection. But it does not have to go into evidence, and it does not have to be submitted to opposing counsel for examination.

The Court: Is he going to use that memorandum?

Mr. Mulliken: He is not going to use this memorandum. He is going to testify from his independent recollection. Now, I've got some other notes in my file I have made about other witnesses, and Mr. Franklin has no right to examine my file.

The Court: You say he may use a statement to refresh his recollection. What statement is he going to use?

Mr. Mulliken: He's going to use a memorandum he made.

The Court: Is that the same memorandum you are reading from?

Mr. Mulliken: No.

The Court: Is the memorandum you read from a copy of what he made?

Mr. Mulliken: I don't know. He has got a memorandum about his conversation. I've got one, too.

Mr. Franklin: Where did Mr. Mulliken get his if he didn't get it from Mr. Luig?

Mr. Mulliken: I got it from Mr. Luig. He made a memorandum at the time he talked to Payne, and he made it, typed up another memorandum and gave it to me. I'm using the one that he typed up and gave to me. And this is a work product in preparation for this case. It's not a party in interest. And I think if Your Honor is going to fine somebody for contempt of Court, or throw them in jail, you will have to fine me or throw me in jail.

Mr. Franklin: Well, I'm not anxious to have Mr. Mulliken in jail, but I am anxious—.

The Court: I'm not anxious to try any collateral matters here. But I don't think you can use some statement and then not let opposing counsel see what statement you are using.

Mr. Franklin: For all we know that statement contains things that further explain and fully modify the portion that he read to this witness. It's universal in handling impeachment matters that if you seek to impeach a person on a written statement you have to produce it so that it can be determined whether there were other things in that that explain away or modify what has

289

been said in the portion that the examiner has selected to use for impeachment.

Mr. Mulliken: I have here a whole sheaf of papers that I have prepared one way or another, preparing for this trial.

The Court: I'm not asking about any whole sheaf of papers that you have, or what you have prepared. I'm only concerned about this statement that you were reading from.

Mr. Mulliken: I didn't read from the statement. Now, Your Honor, I said to this witness, did you have an interview with Mr. Luig on or about April 26th, 1961. And I looked here because this is written down that Mr. Luig went to see him on April 26th, 1961, in the course of preparation for this trial. And did you say to Mr. Luig at that time this or this in substance, that Royse wasn't completely sober; he couldn't thread a needle, but he could hit a nail. And I'm not reading exactly what is written on there when I say this now.

Mr. Zimmerly: That's all the more reason, Your Honor, we should have the right to see it, because—.

The Court: Let me ask you this. Are you will ing to let the Court look at that statement?

Mr. Mulliken: Yes sir, as long as you don't show it to Mr. Franklin, or Mr. Zimmerly, or Mr. Capel."

Mr. Mulliken then surrendered the document to the court for examination. It was not shown to opposing counsel but was impounded by the court. The contempt order followed.

A copy of the document is incorporated in the report of proceedings. It is headed "Memorandum of Interview with Chester Payne." This document is a two-page typewritten document in narrative form pur-

290

porting to set forth *Joseph Luig's version* of his interview with Payne. To illustrate, the memo starts out "I contacted Chester Payne, etc." and "When I arrived, etc." and "I persisted in questioning along this line, etc." and "Mr. Payne explained the fact, etc." and "Mr. Payne stated etc." and "He Payne gave some indication of not particularly liking Royse etc." Significantly, the name Joseph Luig is *typed* at the end of the statement under the date 4/28/61 although the interview occurred on April 26, 1961. It is quite apparent from the foregoing that on April 26, 1961, Joseph Luig talked to the witness Payne about the occurrence in question. Two days later he dictated his version of the interview, either from his recollection of the interview or notes he made. Obviously the document is not a signed statement of the witness. It is equally apparent that it is not an unsigned statement of the witness. It is simply what it purports to be, namely, a memorandum made by Luig of his version of an oral interview with Payne.

██ The question involved in this case does not arise under an interpretation of the pretrial discovery rules. The question involves a rule of trial procedure apart from the pretrial discovery rule. In fact, in his brief the State's Attorney says: "The point involved in the case at bar is not whether the document here in question should have been available in pretrial discovery proceedings" and further, "It is conceded that the plaintiff could not have reached this document at the pretrial discovery stage."

The cases of People v. White, supra, and Eizerman v. Behn, 9 Ill App2d 263, 132 NE2d 788, are controlling of the question involved in the case at bar. The appellant, Wallace M. Mulliken, during his cross-examination of the witness Payne was undertaking to lay a foundation for impeachment of the witness by showing prior *oral* contradictory statements. In so do-

291

ing he was following the generally accepted procedure of asking the witness whether he had, at a certain designated time and to a designated person made the oral statement. Illinois Cent. R. Co. v. Wade, 206 Ill 523, 69 NE 565. A negative answer would have then permitted the calling of Luig to the stand to testify to the contradictory oral statement by Payne to Luig. The witness was not shown the document in question nor was it used by the witness. The mere reference to the memorandum by appellant Mulliken for the purpose of assisting him, Mulliken, in laying a proper foundation for calling Luig to the stand to testify to the contradictory statements of Payne, does not constitute such a use of the document or memorandum as would require counsel to submit it to opposing counsel for examination. The trial court was therefore in error in holding appellant in contempt for refusing to do so.

Accordingly the judgment of the Circuit Court of Champaign County is reversed.

Reversed.

REYNOLDS, PJ and CARROLL, J, concur.