(No. 42752.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
ROBERT TOMASHEVSKY *et al.*—(KATHIE BOUDIN *et al.*,
Appellants.)

*Opinion filed June 24, 1971.*

SCHAEFER, J., took no part.

RONALD J. CLARK, of Chicago, (JENNER & BLOCK, of
counsel,) for appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield,
and EDWARD V. HANRAHAN, State's Attorney, of Chicago,
(JAMES B. ZAGEL, Assistant Attorney General, and ROBERT
A. NOVELLE and ARTHUR BELKIND, Assistant State's At-
torneys, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

This appeal is taken from a purported judgment order
of the circuit court of Cook County sentencing the appel-

lants, Kathie Boudin and Jean Yonemura, to five-day jail sentences, respectively, for contempt. Constitutional issues are raised. 43 Ill.2d R. 603.

The appellants were among numerous defendants who had been indicted for the offense of aggravated battery. On November 14, 1969, the appellant, Boudin, appeared before the trial judge to whom the cases were assigned and filed a motion for substitution of judges. The motion was allowed and the case was transferred back to the presiding judge of the criminal division for reassignment. On December 2, 1969, 18 of the defendants appeared before the presiding judge when the case was called.

The judge inquired of Robert Tomashevsky, one of the defendants, whether he had a lawyer, a job, or whether he was going to get a job, and what, if any, efforts he had made in that regard. During this very brief conversation, Tomashevsky indicated that he was connected with the Students for a Democratic Society, commonly referred to as S.D.S., whereupon the judge asked, "Who is in charge of the S.D.S. ?" At this point the record indicates that there was laughter in the courtroom and the judge ordered, "Lock them all up. I'll talk to them one at a time. This isn't a game we're playing. Lock them up," and further stated, "Come on, lock them up. Ten days for contempt."

All of the defendants, including the appellants, were thereupon taken to the jail and a hearing was set on the 18 contempt charges for 2 :00 P.M., the same day. It appears from the appellant's brief that, during the recess between the morning session and the 2 :00 P.M. hearing, a proposed order was prepared which stated:

"1. The Court finds that during the course of the hearing, the following exchange took place between Judge Power and the defendants:

a. Judge Power asked Robert Tomashevsky, 'Are you working?'

Tomashevsky responds, 'No.'

b. Judge Power asked him, 'Where do you live?' Tomashevsky responds, '863 Lill.'

c. Judge Power asked him 'Where do you get your money?'
Tomashevsky responds, 'I get $15.00 a week from S.D.S.'

d. Judge Power asked him, 'When are you going to have a lawyer?'
Jeffrey Haas interjects and said he would represent him at this hearing.

e. Judge Power asked Tomashevsky, 'Why don't you have a job?'
Tomashevsky says, 'I have too many felonies and I belong to S.D.S.'

f. Judge Power asked him, 'Where have you sought after a job.'
Tomashevsky responds, 'As a dishwasher on West Madison Street.'

g. Judge Power asked him, 'Why don't you go to the Illinois Employment Service?'
Tomashevsky responds, 'I'm from New York.'

h. Judge Power then asked, 'Who is in charge of the S.D.S.?' wherein all 18 defendants before the Court joined in concerted raucous laughter."

The proposed order also stated that the conduct of the defendants, and each of them, "disturbed the decorum of the court and was calculated to disturb and impede the due administration of justice," and ordered that the defendants serve a sentence of ———— days in the county jail. The order was never signed by the trial judge and was never entered of record.

At the commencement of the 2:00 P.M., hearing, the court addressed the defendants individually. The primary purpose of each interview appeared to be to determine which of the individual defendants had laughed during the morning session. The proposed order hereinabove referred

to was presented to each of the defendants, and each one, in turn, was asked to give his or her response to the document. In response to the court's questions, 16 of the respective defendants indicated that they either had not laughed, had laughed but had not intended to or didn't remember whether or not they had laughed. None of them remembered which, if any, of the other defendants might have laughed. The judge was obviously satisfied with the responses made by the 16 defendants, and apparently considered each of them no longer to be in contempt of the court.

The appellant Boudin was engaged by the court in a rather lengthy discussion, a portion of which was as follows:

"DEFENDANT BOUDIN: It says here that it was calculated to disturb and impede the administration of justice. And I say that it is not what the laughter was all about today.

THE COURT: But you do admit there was laughter?

DEFENDANT BOUDIN: There was laughter.

THE COURT: And that you were involved, is that right?

DEFENDANT BOUDIN: I admit there was laughter in the courtroom.

THE COURT: Weren't you involved?

DEFENDANT BOUDIN: Before I could answer that question, I would have to talk to my attorney.

THE COURT: Well, I'm just asking, did you laugh?

DEFENDANT BOUDIN: I couldn't answer that question before I talked to my attorney.

THE COURT: Do you refuse to answer that question?

DEFENDANT BOUDIN: Yes, I refuse to answer that question.

THE COURT: Put her over here."

Earlier in the conversation, Boudin twice stated to the court

that whatever happened in the courtroom was not designed to dishonor or disturb the court.

The court next interrogated the appellant Yonemura. Her request to consult with counsel before answering any questions was also refused. Her answers to the court's questions were in substance that she did not feel that she should be held in contempt, and that she did not feel that she had disrupted the court. She refused to answer the specific question as to whether or not she had laughed, at which point the trial court found her in contempt.

So far as the record discloses, there were no written charges, no written order of contempt or commitment, and no order containing any findings of fact upon which the alleged contempt in this case was based. Such circumstance was further verified by counsel for the appellants and the State in argument.

In *People ex rel. Andrews* v. *Hassakis,* 6 Ill.2d, 463, at pages 466 and 467, we considered the court's power to punish for contempt and stated:

"* * * Punishment for indirect criminal contempt, that is for contumacious acts outside the personal knowledge of the judge, requires the observance of all the elements of due process of law, that is, notice, written charges, and an opportunity to deny and defend such charges before guilt is adjudged and sentence imposed.

"Direct contempt, that is contumacious acts committed in court in the presence of the judge, and of which he has personal knowledge, may be adjudged and punished in a summary manner, without prior notice, written charges, plea, issue or trial. (*In re Terry,* 128 U.S. 289; *People* v. *Siegal,* 400 Ill. 208.) The act having been committed in the presence of the court, evidence is unnecessary and no record need be made. (*People ex rel. Owens* v. *Hogan,* 256 Ill. 496.) But in this State the accused has a right of appeal to review the decision of the trial judge finding him guilty of

contumacious acts and a reviewable record must therefore be made by a written order setting forth fully, clearly and specifically the facts out of which the contempt arose so that the reviewing court may determine if the committing court had jurisdiction to enter the order. *People* v. *Rongetti,* 344 Ill. 107; *People* v. *Loughran,* 2 Ill.2d 258."

In *People* v. *Tavernier,* 384 Ill. 388, in considering where the burden of proof lies in the defense of a direct contempt order, at page 393, we stated: "The cases all recognize the power of courts of record to conduct proceedings for contemptuous acts committed in the presence of the court and to administer punishment in proper cases. This may include a fine or jail sentence, or both. When a court thus instantly punishes without further proof or examination, without plea, trial or issue, it is exercising a power which is not recognized in other proceedings and one which may be arbitrarily used. To safeguard against abuse a review may be had, and since the case is submitted to a reviewing court on the order of commitment, the law imposes upon those who defend the entry of the order the burden of having it contain facts sufficient to show that the court was warranted in entering the order."

Our appellate courts have held that the court on review of a direct contempt proceeding may look to the report of proceedings in addition to the contempt order to determine whether the contempt order was correct (*In re Dunagan,* 80 Ill. App. 2d 117, 123; *People ex rel. Morgan* v. *Mulliken,* 41 Ill. App. 2d 282, 283); and they have further held that since the report of the proceedings reflects what actually occurred in open court, the findings in the order of contempt, if in conflict with the report of proceedings, do not control; and that it is only where there is no report of proceedings that the reviewing court will not go behind the order but is bound to assume that the findings are correct. (*People* v. *White,* 8 Ill. App. 2d 428, 434.) However, such pronouncements do not mean that a direct contempt com-

mitment can legally exist without a supporting contempt order. Prudence would dictate that the order should be in writing so that the contumacious acts may be set forth fully, clearly and specifically. Thus, the reviewing court could readily determine whether the committing court had jurisdiction to enter the order. It is conceivable that the record could reflect oral findings and an order which would be adequate to support the charge of direct contempt. However, the record in the case at bar, is deficient in this respect.

The lines of demarcation between direct and indirect contempt can be, and frequently are, indistinct, in that specific acts may have certain of the attributes of each classification. *People* v. *Gholson,* 412 Ill. 294, 298, 299.

If laughter in the courtroom constituted the ground for the contempt charge, it is apparent that the trial judge did not have personal knowledge of whether the appellants laughed and therefore he sought to resort to extrinsic evidence to establish such fact. Under the rationale of *People ex rel. Andrews* v. *Hassakis,* 6 Ill.2d 463, 466, and 467, the charge against the appellants could not be direct contempt since the trial judge did not have personal knowledge that they had laughed, even though the laughter occurred in the courtroom in his presence. (*People* v. *Howarth,* 415 Ill. 499, 508; *People* v. *Berof,* 367 Ill. 454, 455 and 456.) If the conduct of the appellants constituted indirect contempt—contumacious acts outside the personal knowledge of the judge —then all the elements of procedural due process must be observed, including notice, written charges, and an opportunity to deny and defend such charges before guilt is adjudged and sentence imposed. *Johnson* v. *Mississippi,* 39 L.W. 4721, June 8, 1971; *People* v. *Hassakis,* 6 Ill.2d 463, 466; *People* v. *Rosenthal,* 370 Ill. 244, 248, 249.

Thus, since the purported adjudications in this case, if for direct contempt, are supported by neither an order of contempt, nor an adequate record, and, if for indirect contempt, the appellants have not been accorded the require-

566

ments of procedural due process, the purported conviction of each of the appellants is hereby found to be void and without force, and the appellants are discharged.

*Orders set aside, and appellants discharged.*

Mr. JUSTICE SCHAEFER took no part in the consideration or decision of this case.