2020 IL App (1st) 181360-U

THIRD DIVISION
November 25, 2020

No. 1-18-1360

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | ACC 180020 |
| | ) | |
| NORMAN HALL, | ) | Honorable |
| | ) | Vincent M. Gaughan |
| Defendant-Appellant. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Reversed. Finding of direct criminal contempt for conduct occurring outside presence of trial judge cannot stand, as defendant was not provided required procedural safeguards. Nor does record reveal second basis for direct contempt finding.

¶ 2    The circuit court found defendant guilty of direct criminal contempt for being disrespectful to the sheriff's deputy assigned to the courtroom. Defendant's conduct occurred outside the presence of the circuit judge, but the court cited defendant for direct contempt because the events took place within the courtroom.

¶ 3    Defendant claims that his contempt conviction for his disrespect toward the deputy must be reversed, as he was not provided the necessary procedural safeguards before conviction. The State agrees, and so do we. But the State claims that the trial court actually convicted defendant

of a *second* count of direct criminal contempt for disobeying the court's instruction not to speak. We find no basis in the record to support the State's position. We thus reverse defendant's single contempt conviction.

¶ 4                                    BACKGROUND

¶ 5      Defendant was scheduled to appear before the circuit court for pre-trial matters relating to a pending criminal charge against him. While court was in session, he attempted to check in with the court clerk. As he was trying to do so, a deputy sheriff assigned to the courtroom, Deputy Vergara, took offense to defendant's conduct. Later, the clerk called defendant's case, "Norman Hall." To give some context here, as defendant notes in his brief before this court, defendant has indicated in his pre-sentence investigation interview that he "identifies as a 'Moor' and has adopted the name of 'Mohammed Bey,' though he acknowledge[s] that the American legal system knows his name to be Norman Hall."

¶ 6      In any event, when defendant's case was called, the court asked Deputy Vergara and her sergeant to explain what had happened outside the judge's presence. Because the record is short, we will recite it here nearly in full:

> "THE CLERK: Norman Hall.
>
> THE COURT: So everything is going to happen. There was a young lady standing up when another case was called and you went—Deputy Vergara state your name. Spell your last name.
>
> DEPUTY VERGARA: Deputy Jessica Vergara, star 11173, V-e-r-g -a-r-a.
>
> THE COURT: Relate what happened when the Court was going on.
>
> DEPUTY VERGARA: I stepped back and told the young lady to sit down. He—
>
> THE COURT: Who is he?

DEPUTY VERGARA: Defendant said pfft. I said, if there is a problem, step out of the courtroom. He did it again. I asked him to step out and he did it a third time as he was walking out of the courtroom.

THE COURT: Anything else?

DEPUTY VERGARA: When he was asked what's his name, he gave the last name of Bae.

THE COURT: Who asked for the name?

DEPUTY VERGARA: Sergeant.

THE COURT: State your name.

SERGEANT GERCONE: Sergeant Michael Gercone, G-e-r-c-o-n-e, star number 1147.

THE COURT: You had a conversation with him?

SERGEANT GERCONE: Yes, I did.

THE COURT: What happened?

SERGEANT GERCONE: He wanted to approach to talk to the clerk to check in and I said I would do it for him and he gave me the name of Bea, B-e-a.

THE DEFENDANT: B-e-y.

SERGEANT GERCONE: I stand corrected.

THE COURT: Is there any alias he is under under [sic] Bey?

MS. SIMS: Judge, this is my first appearance on the case and my first day meeting Mr. Hall. I know meeting him today, I have only known the name Mr. Hall.

THE COURT: All right, thank you. Mr. Hall, you have disrupted my court. You disrespected the deputy. When the deputy asks you to do something or tells you to do

something, she is speaking on my behalf. Same with the Sergeant. I find your conduct disrespectful to this Court. You have taken time to effect the administration of justice at this time. So I am going to hold you in direct contempt. Have we got the BCX back?"

¶ 7    At that point, the parties discussed the issue of defendant's behavioral clinical examination (BCX) for fitness to stand trial on his substantive charge, after which the trial judge returned to the subject of bond for defendant:

"THE COURT: Mr. Hall, relax a little bit. We are going to look at bond. I want to—

THE DEFENDANT: Mr. Gaughan. Mr. Gaughan, if I can speak, sir.

THE COURT: You cannot speak right now.

THE DEFENDANT: Okay, sir. And for the record, my name is Mohammad Bey."

THE COURT: Take him into custody. I find you in direct contempt."

¶ 8    The case was passed and later recalled. The trial court asked for a "presentence order on direct contempt," reordered the BCX, and set April 5, 2018 for the next hearing date. The court denied bond for defendant. Defendant then asked, "So your Honor, you're saying I don't have a right to speak in your courtroom?" The court responded: "Oh, yes, you do. We will see you on the fifth of April."

¶ 9    The court then entered a written order that stated, in its entirety: "Direct contempt[,] BCX Ordered[,] NO BAIL[,] o/c 4/5/18[,] 8:30 AM."

¶ 10    At the status on April 5, 2018, the court discussed preliminary matters, primarily on the substantive charges against defendant, not the contempt, concluding as follows:

"THE COURT: All right. On the contempt, it will be order of Court, May 9, 2018. On the substantive case, it will be by agreement, May 9, 2018, State to complete discovery.

THE STATE: Thank you, your Honor.

THE SHERIFF: Mr. Hall, step back.

THE DEFENDANT: Your Honor?

THE COURT: Mr. Hall, step back.

THE DEFENDANT: I thought I had a right to speak to the Court.

THE COURT: You have a right at trial to present evidence. You don't have a right, right now.

THE DEFENDANT: It was—

THE COURT: All right.

THE SHERIFF: Mr. Hall, step back.

THE COURT: Don't get yourself in more trouble right now."

¶ 11    During the May hearing, defendant expressed a desire to proceed *pro se* with standby counsel. The court questioned whether defendant wanted to proceed *pro se* on both charges—the substantive one and the contempt. Defendant explained:

"Well, no, I thought I made it clear to [defense counsel] that I don't think I have—I stand a chance to argue with you on the contempt charge because it's based on my conversation and how I—my breathing exercises when I'm talking to you, that the bailiff found it was disrespectful and you found it was disrespectful to the Court, but it was just breathing techniques that I have—"

¶ 12    The court cut defendant off and explained that "Mr. Hall, I understand, but at this stage, in the contempt, this is for sentencing, not for trial, you've been convicted already. When I find you're in direct contempt, that's a conviction."

¶ 13    Counsel for defendant then told the judge that defendant "wanted me to file a motion to dismiss the direct contempt of court." The court's response was, "How is that legal? Have a seat, Mr. Hall, we're going to go to sentencing right now."

¶ 14    The court then allowed the State and public defender to argue aggravating and mitigating factors in determining defendant's contempt sentence. After argument, the court allowed defendant to make a statement. Defendant once again attempted to explain that he had not meant to be disrespectful or impede the court in any way. Instead, he was just practicing breathing exercise to deal with the stress of being in court. He finished by specifically apologizing to the court and sheriff.

¶ 15    In rendering its judgment, the court stated:

"Mr. Hall, I'm taking this into consideration, but I also—there was a very high profile case that was up that day, and since then, we found out that there was more than 8200 articles, new articles written about this case in major newspapers, and over one million one hundred twenty thousand hits on Google.

Your action that day could have incited the whole courtroom to go up in a riot type fashion. So I have to look at those. But I also understand what you're saying. So I'm mitigating that with what—what's happened.

All right. So this is going to be a misdemeanor, I'm not going to sentence you as a felon.

So I'm going to sentence you to 150 days Cook County Department of Corrections. I'm giving you credit for 70 days. I'm going to put you on probation for 14 months, misdemeanor probation, $20 a month probation cost."

¶ 16    Defendant filed a motion to reconsider, which was denied. He now timely appeals.

¶ 17                                    ANALYSIS

¶ 18    There are two types of criminal contempt: direct and indirect. *People v. L.A.S.*, 111 Ill. 2d 539, 543 (1986). Generally speaking, direct criminal contempt occurs " 'in the very presence of the judge, making all elements of the offense within his own personal knowledge.' " *Id*. (quoting *People v. Harrison*, 404 Ill. 320, 323-24 (1949)). Again generally, direct criminal contempt may be summarily punished, because the trial judge personally witnessed the alleged conduct and requires no further "proof," so to speak. *Id*. at 544; *Windy City Limousine Co. LLC v. Milazzo*, 2018 IL App (1st) 162827, ¶ 41.

¶ 19    In contrast, indirect criminal contempt is used for conduct where an " 'essential part occurred out of the presence of the court, is not admitted, and which is therefore dependent for its proof upon evidence of some kind.' " *L.A.S.*, 111 Ill. 2d at 544 (quoting *Harrison*, 404 Ill. at 324). Because the trial judge lacks personal knowledge of the events, and thus proof of the contemptuous conduct is required, the traditional due-process protections attending a criminal prosecution apply. *L.A.S.*, 111 Ill. 2d at 544; *Milazzo*, 2018 IL App (1st) 162827, ¶ 46; *In re Marriage of Betts*, 200 Ill. App. 3d 26, 58 (1990) (indirect criminal contempt proceedings "must generally conform to the same constitutionally mandated procedural requirements as other criminal proceedings"). Those due process protections include: (1) being charged by a written petition, complaint, or information; (2) being informed of the nature of the charges; (3) personal service; (4) the ability to file an answer; (5) a public trial where the contemnor may present evidence, subpoena witnesses, and confront and cross-examine witnesses; (6) the privilege against self-incrimination; (7) the presumption of innocence; and (8) the requirement of proof beyond a reasonable doubt. *Milazzo*, 2018 IL App (1st) 162827, ¶ 45; *In re Marriage of*

*Weddigen*, 2015 IL App (4th) 150044, ¶ 27; *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 20.

¶ 20    As the parties agree, however, defendant's alleged disrespect towards Deputy Vergara falls within a specific intersection of the two forms of criminal contempt that is considered a subcategory of "direct" contempt, even though the judge did not personally witness the alleged conduct, because the conduct took place "in an integral or constituent part of the court." *Betts*, 200 Ill. App. 3d at 48 (citing *People v. Javaras*, 51 Ill.2d 296, 299 (1972)). In that event, the allegedly contemptuous conduct is "deemed to have occurred in the constructive 'presence of the court.' " *Javaras*, 51 Ill. 2d at 299 (quoting *People v. Skar*, 30 Ill. 2d 491, 495 (1964)). We have referred to this form of direct contempt as "constructive direct criminal contempt." *Milazzo*, 2018 IL App (1st) 162827, ¶ 42.

¶ 21    An example of constructive direct criminal contempt would be refusing to comply with a grand jury subpoena. See *Skar*, 30 Ill. 2d at 493. Another is the filing in probate of a will "known to be spurious." *People ex rel. Kunce v. Hogan*, 67 Ill. 2d 55, 60 (1977). We recently considered a false representation made in an agreed temporary restraining order to constitute constructive direct criminal contempt. *Milazzo*, 2018 IL App (1st) 162827, ¶ 45. Given those examples, we do not hesitate to agree with the parties that the alleged misconduct here, which took place within the courtroom while in session, though outside the knowledge of the trial judge, is properly characterized as constructive direct criminal contempt.

¶ 22    Though it falls under the general category of direct contempt, constructive direct criminal contempt is the "functional equivalent" of indirect criminal contempt. *Id*. Because the judge did not witness the conduct and thus has no personal knowledge of it, the alleged conduct must be proven by external facts in a hearing accompanied by the due process protections applicable to

indirect criminal contempt proceedings that we detailed above. *Id*. ¶ 42 ("allegations of constructive direct contempt may not be resolved summarily, and the alleged contemnor is entitled to certain due process rights, which depend upon whether the contempt charge is civil or criminal."); *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 27 (alleged contemnor "is entitled to all of the constitutional protections and procedural rights afforded to other criminal defendants." ); *People v. Hixson*, 2012 IL App (4th) 100777, ¶ 14.

¶ 23    The State concedes that defendant was entitled to these due process protections and that he did not receive them. Again, we readily agree. As the record quoted above shows, defendant was convicted at a summary hearing where he was not even allowed to speak, much less confront the witnesses or defend himself in any way whatsoever. Defendant was not afforded a single one of the due process safeguards we listed above. We thus agree with the State that defendant's contempt conviction for his alleged disrespect toward Deputy Vergara must be reversed. See *Dart*, 2012 IL App (1st) 103504, ¶ 26 ("given the complete lack of procedural and constitutional rights afforded to [contemnor], we conclude that the circuit court's [contempt] order *** must be reversed.").

¶ 24    But in the State's eyes, that does not end the matter. The State claims that the court actually held defendant in contempt on *two* counts, not one. In addition to the charge of disrespecting the sheriff's deputy, says the State, the court also held defendant in contempt for speaking after being told by the judge not to speak.

¶ 25    Recall, as quoted at length above, that after finding defendant in contempt and discussing the status of defendant's BCX, the court returned to the question of bond:

> "THE COURT: Mr. Hall, relax a little bit. We are going to look at bond. I want
>
> to—

THE DEFENDANT: Mr. Gaughan. Mr. Gaughan, if I can speak, sir.

THE COURT: You cannot speak right now.

THE DEFENDANT: Okay, sir. And for the record, my name is Mohammad Bey."

THE COURT: Take him into custody. I find you in direct contempt."

¶ 26    The State says that last sentence quoted above was the trial judge entering a second count of direct criminal contempt for defendant speaking after being told he could not. And this instance of contempt having taken place directly in the presence of the judge, the State urges that this second finding of contempt would fall under the classic definition of direct criminal contempt.

¶ 27    That second point is certainly true; if the court made a second finding of contempt at that juncture, it was unquestionably a finding of direct criminal contempt, not one of "constructive" direct criminal contempt. The contested question, however, is whether the trial court did, in fact, find defendant in contempt a second time with that statement, as opposed to simply reiterating its initial, single finding of contempt.

¶ 28    We begin by reviewing the trial court's written order. Our supreme court has long noted that, because direct criminal contempt proceedings usually lack the formalities of an evidentiary hearing and adequate record, the written order is critical. *People v. Tomashevsky*, 48 Ill. 2d 559, 563–64 (1971); *People v. Loughran*, 2 Ill. 2d 258, 263 (1954).

¶ 29    The written order is of such importance because "the accused has a right of appeal, and it is, therefore, necessary for the court to enter a written order setting forth fully and clearly the facts out of which the contempt arose so that the reviewing court may determine if the committing court had jurisdiction to enter the order." *Loughran*, 2 Ill. 2d at 263; see also

*Tomashevsky*, 48 Ill. 2d at 563–64 ("[I]n this State the accused has a right of appeal to review the decision of the trial judge finding him guilty of contumacious acts and a reviewable record must therefore be made by a written order setting forth fully, clearly and specifically the facts out of which the contempt arose so that the reviewing court may determine if the committing court had jurisdiction to enter the order."). It is thus "well settled that a judgment order of direct criminal contempt must set forth the specific facts which form the basis for the order." *People v. Coulter*, 228 Ill. App. 3d 1014, 1019 (1992); *Petrakh v. Morano*, 385 Ill. App. 3d 855, 859 (2008) (order must contain sufficient facts to show contempt conviction was warranted).

¶ 30    Here, the court's order from that hearing, in its entirety, states: "Direct contempt[,] BCX Ordered[,] NO BAIL[,] o/c 4/5/18[,] 8:30 AM." That order gives no hint that more than one count of direct contempt was imposed. It suggests, in fact, quite the opposite.

¶ 31    But while a comprehensive written order is the "better practice," our supreme court has allowed the court to "look to the record to determine whether the contempt order was correct." *People v. Baxter*, 50 Ill. 2d 286, 289-90 (1972); *Tomashevsky*, 48 Ill. 2d at 564; *Coulter*, 228 Ill App. 3d at 1019 ("where a complete record of the proceedings giving rise to the contempt order is available together with statements of the court regarding the order, an appellate court will consider that record when reviewing a contempt order.") So we will consider the record as well.

¶ 32    Our review of the transcripts as a whole (which we have quoted in all relevant parts above) likewise does not demonstrate the existence of more than one contempt conviction. At sentencing, the court noted that there was "a very high profile case that was up" on the day of defendant's alleged contemptuous behavior, and that defendant's "action that day could have incited the whole courtroom to go up in a riot type fashion." The court was obviously talking about defendant's behavior toward the sheriff's deputy, not defendant's telling the court his

name during the contempt proceeding. The court then stated that "*this* is going to be a *misdemeanor*," clearly referencing a single conviction. And we would add that, in informing defendant of his right to appeal, the court referred to "a right to appeal both the finding of direct contempt and also the sentencing"—"the finding," singular.

¶ 33 Taking it together, it is clear that the trial court was only finding defendant in direct criminal contempt for his actions toward the sheriff's deputy, and not additionally for "disobeying" the judge's order not to speak by stating his adopted Moorish name for the record. The order, the transcript of the contempt proceeding, and the transcript at sentencing leave us with only that conclusion.

¶ 34 We would add a measure of common sense, as well. We find it hard to believe that the seasoned trial judge would have imposed a second count of contempt because defendant merely gave his adopted name to the court. Recall the context. Much of the colloquy and testimony during the abridged contempt proceeding concerned the discrepancy between defendant's official name—Norman Hall—and his telling the sergeant that his name was Bey. Indeed, the judge went so far as to ask defense counsel whether defendant had an alias, to which defense counsel had no answer (she had just met her client). Defendant was obviously trying to make the point that he was not playing games with that name—it was the name by which he preferred to be addressed. So when he asked the trial court if he could speak, and the trial court said no, defendant's response—"Yes, sir. And for the record, my name is Mohammed Bey"—would be quite unlikely to prompt an independent finding of contempt (and quite unlikely to get a favorable reception in this court if it had).

¶ 35 In any event, our review of the record reveals only a single conviction for constructive direct criminal contempt. Because the court did not follow the proper due process procedures

before convicting defendant, that contempt conviction cannot stand. If the trial court desires to again pursue constructive direct criminal contempt charges against defendant for his conduct toward the sheriff's deputy—despite the fact that defendant has already served his 150-day sentence—the court "may do so, but all procedural safeguards associated with an indirect criminal contempt proceeding * * * must be followed." *Milton v. Therra*, 2018 IL App (1st) 171392, ¶ 49.

¶ 36                                   CONCLUSION

¶ 37     The judgment of the circuit court is reversed.

¶ 38     Reversed.