2018 IL App (1st) 162827

FIRST DISTRICT
FOURTH DIVISION
December 20, 2018

No. 1-16-2827

| | | |
|---|---|---|
| WINDY CITY LIMOUSINE COMPANY LLC, an Illinois Limited Liability Company, and WINDY CITY LIMOUSINE MANAGER LLC, an Illinois Limited Liability Company, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Nos. 15 MC1 600041   15 MC1 600042 |
| SAL MILAZZO, JANET MILAZZO, and SIGNATURE TRANSPORTATION GROUP LLC, an Illinois Limited Liability Company, | ) ) ) ) | |
| Defendants | ) ) ) | Honorable Neil H. Cohen, |
| (Sal Milazzo and Janet Milazzo, Defendants-Appellees). | ) | Judge presiding. |

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Reyes concurred in the judgment and opinion.
Justice Gordon specially concurred, with opinion.

## OPINION

¶ 1     Windy City Limousine Company LLC and Windy City Limousine Manager LLC (collectively, Windy City) sued Sal Milazzo (Sal), Janet Milazzo (Janet) and their company, Signature Transportation Group LLC (Signature), based on the Milazzos' alleged misappropriation of Windy City's confidential information, which they then allegedly used to create Signature, a competing transportation company. During the course of litigation, the circuit court entered an agreed order between the parties that granted Windy City a temporary

restraining order, barring the Milazzos from using, accessing, or distributing Windy City's confidential information. In the order, the Milazzos also made a representation about their prior conduct concerning Windy City's confidential information. Several months later, Windy City filed a petition seeking to hold both Milazzos in indirect criminal contempt for making a false representation in the temporary restraining order and violating the order itself. Windy City then dismissed Janet from the contempt proceedings but later reinstated her. Ultimately, on the Milazzos' motion, the circuit court dismissed the petition for failing to allege a violation of the temporary restraining order and denied Windy City's motion to reconsider.

¶ 2     In this appeal, Windy City contends that the circuit court erred when it dismissed its petition for indirect criminal contempt against the Milazzos and denied its motion to reconsider. For the reasons that follow, we affirm the court's rulings.

¶ 3                                I. BACKGROUND

¶ 4     Since 2006, Windy City has operated a limousine and transportation company with a fleet of more than 200 vehicles primarily in the Chicagoland area. Windy City had employed the Milazzos, Sal as its vice president of sales and operations, and Janet as its controller. However, during a meeting on February 14, 2014, the Milazzos were fired.

¶ 5                             A. Underlying Litigation

¶ 6     In April 2014, Windy City filed a complaint against the Milazzos and Signature, alleging that, after Windy City fired the Milazzos, they misappropriated its confidential information and used the information to create Signature, a direct competitor.

¶ 7     The Milazzos and Signature filed an answer, admitting that, due to the Milazzos' former positions at Windy City, they had access to its confidential information. They also admitted that, during the morning of February 15, 2014, after they were fired, "Janet copied the data in her

Outlook file at Windy City," but they could not determine the "exact contents of the file" at the time they filed the answer. The Milazzos also filed various counterclaims against Windy City, including breach of contract and retaliatory discharge.

¶ 8 Windy City subsequently filed an amended complaint, alleging that, after the Milazzos learned of their firing at the February 14, 2014, meeting and while the meeting was still ongoing, Sal left the room and called Ryan Kaszmarski, Windy City's information technology manager. Sal asked Kaszmarski to download all of his computer files, but Kaszmarski refused. Early the following morning, according to the complaint, the Milazzos accessed a plethora of Windy City's records, including financial information, customer information, employee information and marketing information. The complaint alleged that they did this by e-mailing three personal e-mail addresses of Janet's from her Windy City e-mail address and each time including a link to a folder that contained Windy City's information.

¶ 9 The complaint asserted that the Milazzos used this information and unlawfully created their new company, Signature, to directly compete with Windy City. The complaint requested that the Milazzos and Signature be temporarily and permanently enjoined from competing with Windy City and using its confidential information. Windy City brought several counts against them including one based on a violation of the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.* (West 2014)), one based on tortious interference with existing and prospective contractual relations as well as one based on alleged conversion of company assets.

¶ 10 In the Milazzos' and Signature's answer, they again admitted that, during the morning of February 15, 2014, Janet copied data in her Outlook file at Windy City. They also stated again that they could not determine the contents of that file at the time.

¶ 11    Shortly thereafter, on May 16, 2014, the parties had a court appearance where their attorneys were present, but the Milazzos themselves were not. The parties' attorneys presented the court with an agreed order that granted a temporary restraining order against the Milazzos and Signature. In the order, prior to the portion specifying the terms of the temporary restraining order, the parties agreed that, for the purposes of the order, confidential information would be defined as any nonpublic information related to Windy City's finances, customers, marketing efforts, research and development data, and employee information—a definition that substantially mirrored the definition of confidential information in Windy City's company operating agreements. Additionally, the order stated that the Milazzos and Signature:

> "hereby represent that they have not, from and after February 14, 2014 to and including [May 16, 2014], used, reproduced, disclosed or otherwise distributed Confidential Information, or any materials containing Confidential Information in any manner that would be a violation of this Order if it had been done after the entry of this Order."

The order continued and specified the terms of the temporary restraining order, which barred the Milazzos, Signature and any of their agents or employees from using, accessing, reproducing, disclosing or distributing any materials containing Windy City's confidential information for any purpose except as necessary to comply with litigation-related discovery. The order also required the Milazzos to return to Windy City within three days "all information, documents and property" that contained confidential information and all other property belonging to Windy City, regardless of whether such information contained Windy City's confidential information, as well as identify any person or entity to which the Milazzos disclosed confidential information.

¶ 12                                   B. Contempt Proceedings

¶ 13    At some point after the circuit court entered the temporary restraining order, Windy City believed that the Milazzos' representation therein about their actions concerning Windy City's confidential information from February 14, 2014, to May 16, 2014, was untruthful and also that they had violated the order itself.

¶ 14    As a result, on February 5, 2015, Windy City filed a petition for indirect criminal contempt against both Milazzos. Windy City began its petition by reviewing the facts that led to the issuance of the temporary restraining order, including the Milazzos' transfer of information to three personal e-mail addresses of Janet during the early morning hours of February 15, 2014. Windy City also pointed out that the Milazzos retained its property, including two laptop computers, which "revealed use after February 14, 2014." Windy City then highlighted that, in the temporary restraining order, specifically paragraph B, the Milazzos represented that they had not used, reproduced, disclosed or distributed any of its confidential information or any materials containing its confidential information from February 14, 2014 to May 16, 2014. Windy City, however, posited that:

> "9. The statement in paragraph B was false.
>
> 10. Respondents transferred Confidential Information from the two Windy City computers in violation of the Order of May 16, 2014. Respondents made use of the Confidential Information in the commencement and conduct of the business of Signature in competition with the business of Windy City from and after February 14, 2014.
>
> 11. The actions of Respondents were not in the actual physical presence of the Court.

12. The actions of Respondents were contemptuous of the Court, in that Respondents lied as to their actions from February 14, 2014 until May 16, 2014, and procured the entry of the TRO by a statement that was knowingly false.

13. The actions of Respondents have continued to be contemptuous until this date, in that Respondents continue to use the Confidential Information in violation of the TRO."

Based on these alleged actions, Windy City requested that the Milazzos be held in indirect criminal contempt and each sentenced to six months' imprisonment as well as fined $500. Windy City's petition was verified and signed by George Jacobs, its president.

¶ 15    The Milazzos subsequently requested that the Cook County State's Attorney's Office prosecute their criminal contempt charges, which the circuit court denied. On March 3, 2015, because Windy City had filed its petition for indirect criminal contempt using the same civil case number as the underlying litigation, the circuit court granted Windy City leave to refile its petition so that the clerk of the circuit court could issue the petition criminal contempt numbers. The following day, Windy City refiled an identical copy of its initial petition.

¶ 16    Thereafter, Janet moved for a substitution of judge, which was denied. Windy City then dismissed the charges against Janet but with leave to reinstate, temporarily leaving only Sal charged with indirect criminal contempt. The circuit court arraigned Sal and informed him the case was a criminal matter and of several rights he had, including the right to compulsory process and the right to present evidence as well as the privilege against self-incrimination and the prosecution's burden to prove his guilt beyond a reasonable doubt. The court, however, told him that, due to the potential punishment he faced, he was not entitled to a jury trial. Sal acknowledged understanding his rights and entered a plea of not guilty. Later, Windy City

reinstated the charges against Janet, filing an identical petition as before except only naming her as the one charged. The court arraigned Janet, who likewise entered a plea of not guilty.

¶ 17    The Milazzos requested bills of particulars, and the circuit court ordered Windy City to comply, which it did, supplying Sal and Janet with separate, but substantially similar, bills of particulars. In the bills of particulars, Windy City provided a detailed accounting of the forensic evidence they believed supported their allegations that the Milazzos should be held in indirect criminal contempt. The bills of particulars were based primarily on affidavits, all dated in the year 2014, from Joseph Fazio, a forensic examiner, who examined two laptop computers, two cell phones and one iPad that Windy City had provided to the Milazzos as part of their employment, which were returned in April 2014. The bills of particulars, however, noted that Fazio could not analyze the metadata of the iPad or cell phones because they had been reset to their factory settings in March 2014, which permanently erased the data that had been stored in them.

¶ 18    Fazio was able to analyze the laptop computers, one which had been given to Janet and one which had been given to Sal. Fazio determined that 47 portable storage devices had been plugged into the computers before and after the Milazzos' termination from Windy City, but the Milazzos only turned over 11 of those devices. Based on his analysis of those 11 devices, Fazio concluded that they had been plugged into a Macintosh computer at some point after the Milazzos' firing. Although Fazio did not have access to the Macintosh computer, he could tell that the portable storage devices contained a plethora of Windy City's information, including all of its accounting records, financial statements, payroll data, vehicle loan documentation, customer lists, and operating cost information. Based on his investigation, Fazio believed that the Milazzos had plugged the portable storage devices into the laptops provided to them by Windy

City, transferred Windy City's information onto the devices, plugged those devices into a Macintosh computer and then transferred the information onto the Macintosh computer.

¶ 19   Fazio's analysis of the laptop computer that Windy City had provided to Janet revealed that portable storage devices had been attached to it on six different occasions following the Milazzos' firing and before May 2014. A list attached to Fazio's affidavit provided the specific dates and times the portable storage devices purportedly had been attached to Janet's computer. However, Fazio was never given access to those portable storage devices, rendering him unable to conclude whether Windy City information was stored on those specific portable storage devices. After reviewing "LNK files" on the computer, which could show what files interacted with portable storage devices, Fazio saw "reference" to portable storage devices containing sensitive information of Windy City, including its QuickBooks accounting database, the accounting program that Windy City had used for many years. Fazio also saw a LNK file referencing a backup of Janet's Outlook e-mail and contacts. According to Fazio, nine LNK files had been "interacted" with following the Milazzos' firing, and he attached a document providing a list of the observable LNK files with the dates and times of their last interaction.

¶ 20   Fazio's examination also revealed that several cloud service accounts—Dropbox, Google Drive, Sky Drive, and Microsoft One Note—had been accessed using Janet's computer, and he saw "reference" to Windy City information on these accounts. All told, Fazio determined that Janet's computer accessed the cloud service accounts 62 times after she and Sal were fired, but Fazio could not determine what actual information the files in the cloud service accounts contained without access to them. Fazio attached a document providing a list of the files seen on the cloud service accounts.

¶ 21    Fazio's analysis of the laptop computer that Windy City had provided to Sal revealed that portable storage devices had been attached to it also on six different occasions following the Milazzos' firing and before May 2014. A list attached to Fazio's affidavit provided the specific dates and times the portable storage devices purportedly had been attached to Sal's computer. However, Fazio was never given access to those portable storage devices, rendering him unable to conclude whether Windy City information was stored on those specific portable storage devices. After reviewing the "LNK files" on Sal's computer, Fazio saw "reference" to portable storage devices containing sensitive information of Windy City, including a reference to a backup of Sal's Outlook e-mail and contacts. According to Fazio, 58 LNK files had been "interacted" with following the Milazzos' firing, and he attached a document providing a list of the observable LNK files with the dates and times of their last interaction.

¶ 22    Fazio's examination also revealed that one cloud service account—Google Drive—had been accessed using Sal's computer, and he saw "reference" to Windy City information on this account. All told, Fazio determined that Sal's computer accessed the cloud service accounts 178 times after he and Janet were fired, but Fazio could not determine what actual information the files in the cloud service account contained without access to it. Fazio attached a document providing a list of the files seen on the cloud service account.

¶ 23    After receiving the bills of particulars, the Milazzos filed a joint motion to dismiss the indirect criminal contempt petition, contending that it should be dismissed for multiple reasons. First, the Milazzos argued that the operative date of February 14, 2014, in the temporary restraining order, wherein they represented that they had not used or distributed any of Windy City's confidential information, did not reflect the true agreement of the parties. The Milazzos posited that April 14, 2014, was the actual operative date agreed to, but it was changed

unbeknownst to them. The Milazzos stated that the order had been negotiated by their former attorney, John Grady, with Windy City's attorney, Michael Pildes. And according to the Milazzos, e-mail correspondences between the attorneys in the week leading up to the order being entered, which were attached to the motion, revealed that, in all of the proposed versions, the operative date was April 14, 2014. In fact, according to the Milazzos, in the e-mail exchanges, both attorneys agreed to a proposed version containing April 14, 2014, as the operative date. Yet inexplicably, in the version signed by the circuit court, the date was February 14, 2014. The Milazzos also highlighted that, in the temporary restraining order in the court's official file, the order is missing the page containing the operative date of the Milazzos' representation. The Milazzos asserted that, because constitutional due process and fairness prohibited the initiation of a criminal case based upon false or misleading information, the ambiguity of the operative date mandated dismissal.

¶ 24    Second, the Milazzos argued that the ambiguity of the operative date of the temporary restraining order also rendered the petition for indirect criminal contempt insufficient because the contempt charge was premised upon a violation of a court order with an operative date that did not reflect the parties' agreement. Third, the Milazzos argued that, in combination, the petition and bills of particulars failed to sufficiently inform them of the nature of the contempt charges.

¶ 25    Windy City responded and included an affidavit from Pildes, wherein he acknowledged that, in earlier exchanges of the proposed temporary restraining order, the operative date of the Milazzos' representation was April 14, 2014. However, Pildes averred that, after the e-mail exchanges with Grady, he noticed the date was an error and it should have been February 14, 2014. After Pildes had a telephone conversation with Grady, they agreed to change the date to February 14, 2014. Grady told Pildes that he would make the change and confirm with the

Milazzos. According to Pildes, on May 16, 2014, Grady brought the unsigned order into court, which contained the date February 14, 2014, and both of them informed the court that their clients had agreed to the order, which the court subsequently signed. Based on Pildes's affidavit, Windy City contended that there was no mistake or ambiguity in the operative date and therefore dismissal was not warranted on such grounds. Windy City further argued that the Milazzos had been fully informed of the charges against them based on the bills of particulars.

¶ 26    The circuit court subsequently entered a written order, dismissing the petition. The court observed that Windy City's allegation was that the Milazzos had violated the temporary restraining order based on events occurring prior to the order being entered on May 16, 2014. The court noted that, when it entered the temporary restraining order, it granted prospective relief to Windy City by barring certain future conduct by the Milazzos, but it did not "retroactively enjoin" them and the representation made by them in the order "was not part of the relief granted." According to the court, regardless of the veracity of the Milazzos' representation and the alleged error of the operative date of that representation, it was "not possible to enjoin a party retroactively." The court found that the Milazzos could not have "willfully violated" the temporary restraining order "based on conduct which had occurred before the entry of the order" and therefore dismissed the petition for failing to allege a violation of the temporary restraining order. Because of its finding, the court stated that it did not need to address the Milazzos' arguments concerning the alleged error of the operative date of their representation and the alleged insufficiency of the petition and bills of particulars.

¶ 27    Windy City subsequently moved the circuit court to reconsider its dismissal, arguing that the Milazzos committed contemptuous conduct by violating the temporary restraining order in multiple manners, including not returning property containing confidential information, lying to

the court about their actions after February 14, 2014, using confidential information in Signature's business, and not identifying the people or entities to whom they distributed confidential information and what information they distributed. Windy City highlighted that its bills of particulars clearly showed the various ways the Milazzos had violated the temporary restraining order and posited that, based on its allegations, there were no *ex post facto* concerns.

¶ 28 The Milazzos responded that Windy City had not brought forth any newly discovered evidence or an alleged change in the law warranting a grant of its motion to reconsider. The Milazzos posited that, in any event, the circuit court properly found that their conduct before the entry of the temporary restraining order could not form the basis for contempt charges.

¶ 29 Windy City replied, arguing that its motion was proper because it had identified errors in the circuit court's application of the law, namely that the Milazzos made a false representation in the temporary restraining order, they had used and reproduced Windy City's confidential information, and they retained its property, all in violation of the temporary restraining order and constituting contempt.

¶ 30 During a May 23, 2016, hearing on Windy City's motion to reconsider, the parties began discussing the sufficiency of the allegations, after which the circuit court intimated that it had dismissed the petition based on a lack of "specificity" and separately remarked that the petition was "lacking" in specificity. The court then acknowledged that the Milazzos' representation about not doing certain actions after February 14, 2014, and stated it wanted additional time to reconsider its original ruling. Before concluding the hearing, the court stated that, based on the Milazzos' failure to turn over more than 30 portable storage devices and a Macintosh computer that allegedly contained confidential information of Windy City, it was concerned about "entrapment" and the portion of the temporary restraining order that required the Milazzos to

return any property that contained confidential information. The court noted that, "if they return [the portable storage devices and Macintosh computer]," which based on Windy City's forensic examination indicated usage after the Milazzos' firing and the presence of confidential information, "they admit they did it," and "if they admit they did it," they would have admitted to lying to the court about not doing anything after February 14, 2014. The court accordingly denied Windy City's motion to reconsider insofar as it related to the Milazzos' failure to return any property that contained Windy City's confidential information because of the "entrapment" concern. The court stated, however, that it would reserve ruling on the remainder of the motion to reconsider. The parties subsequently filed additional briefs in support of their positions.

¶ 31    On September 7, 2016, the circuit court held another hearing on Windy City's motion to reconsider. The court noted that it originally raised the "idea" about a petition for indirect criminal contempt because of its "inherent discretion to run its call and to hold [individuals] in criminal contempt if they violate the Court's orders." Despite this, the court believed the petition for indirect criminal contempt resulted in the parties' failure to "keep[ ] their eyes on the ball *** of what this case is really about." The court asserted that it would not accept any party "playing with this system" and using "gamesmanship" but ultimately wanted the parties to maintain their focus on the civil litigation, not ancillary contempt proceedings. Nevertheless, the court "believe[d] that [its] original ruling was correct in terms of the *ex post facto* nature" and accordingly denied Windy City's motion to reconsider.

¶ 32    Windy City timely appealed the circuit court's dismissal of its petition for indirect criminal contempt, and the court's denial of its motion to reconsider.

¶ 33                                II. ANALYSIS

¶ 34 In this appeal, Windy City contends that the circuit court's dismissal of its indirect criminal contempt petition against the Milazzos was erroneous for several reasons. First, Windy City argues that there were no *ex post facto* concerns because the Milazzos made a false representation to the court in the temporary restraining order, which constitutes contempt. Second, Windy City argues that, to the extent the court dismissed the petition based on its sufficiency, or lack thereof, the ruling was improper as the petition and bills of particulars sufficiently informed the Milazzos of how they allegedly violated the temporary restraining order and committed contempt of court. Third, Windy City argues that the issue of entrapment was irrelevant to the proceedings because the Milazzos never raised the affirmative defense and the defense was nevertheless inapplicable under the circumstances. Lastly, Windy City argues that the court also erred in denying its motion to reconsider because the court improperly justified the ruling by requesting the parties focus their attention on the civil litigation, not because there was a defect in the petition itself. However, before delving into Windy City's specific arguments, we must provide an overview of the law of contempt.

¶ 35 A. Types of Contempt of Court

¶ 36 Contempt of court has been defined as " 'conduct that is calculated to impede, embarrass, or obstruct the court in its administration of justice or derogate from the court's authority or dignity, or to bring the administration of the law into disrepute.' " *People v. Geiger*, 2012 IL 113181, ¶ 26 (quoting *People v. Ernest*, 141 Ill. 2d 412, 421 (1990)). Courts have the inherent authority to reprimand contemptuous conduct because "such power is essential to the maintenance of their authority and the administration of judicial powers." *People v. Simac*, 161 Ill. 2d 297, 305 (1994). There are four main types of contempt: direct civil contempt, direct criminal contempt, indirect civil contempt, and indirect criminal contempt. *People v. L.A.S.*, 111

Ill. 2d 539, 543 (1986); *People v. Gholson*, 412 Ill. 294, 298-99 (1952). Properly identifying the type of contempt is critical because the procedures that must be followed depend on the type of contempt involved. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). Additionally, contempt proceedings are *sui generis* (*Milton v. Therra*, 2018 IL App (1st) 171392, ¶ 33), meaning neither the Code of Civil Procedure (735 ILCS 5/1-101 *et seq.* (West 2014)) nor the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/100-1 *et seq.* (West 2014)) fully apply. *In re Marriage of Betts*, 200 Ill. App. 3d at 48-49.

¶ 37                    1. Civil and Criminal Contempt

¶ 38    Civil and criminal contempt are distinguished based upon *why* the contempt charge was brought. A civil contempt charge is generally brought to compel compliance with a court order, whereas a criminal contempt charge is brought to punish past conduct, *i.e.*, punishing conduct that a court order prohibited. *People v. Warren*, 173 Ill. 2d 348, 368 (1996). In other words, civil contempt concerns future conduct while criminal contempt concerns past conduct. Usually, the distinguishing characteristic between civil and criminal contempt is the alleged contemnor's ability to purge the "contempt charge by complying with the order the court sought to enforce." *Milton*, 2018 IL App (1st) 171392, ¶ 35. An example of civil contempt is where a person ignores a court order to pay maintenance to a former spouse. See *In re Marriage of Logston*, 103 Ill. 2d 266, 285-87 (1984). In this example, the contempt charge is brought to compel obedience with the court order. Meanwhile, criminal contempt is a crime. *People v. Totten*, 118 Ill. 2d 124, 130 (1987). An example of criminal contempt is where a party operates a business despite an order prohibiting its operation. See *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL 113482, ¶¶ 75-76. In this example, the contempt charge is brought to punish conduct that violated a court order. But because criminal contempt is "intended to vindicate the dignity and authority of the

court" and is punitive in nature, the court should not exercise its power to hold a party or individual in contempt lightly. *Ernest*, 141 Ill. 2d at 421.

¶ 39                                    2. Direct v. Indirect Contempt

¶ 40     Direct and indirect contempt are distinguished based upon *where* the contemptuous conduct occurred. A direct contempt charge is brought when the alleged contemptuous conduct occurs in the direct presence of a judge, whereas an indirect contempt charge is brought when the alleged contemptuous conduct occurs outside the direct presence of a judge. *People v. Lindsey*, 199 Ill. 2d 460, 468-69 (2002); *Simac*, 161 Ill. 2d at 306. The crucial distinguishing factor between direct and indirect contempt is the proof necessary to establish the contempt charge. *In re Marriage of Betts*, 200 Ill. App. 3d at 48. Where "the judge does not have full personal knowledge of all elements of the contempt" and external proof of facts is necessary to establish the charge, indirect contempt is the proper characterization. *Id.* But where all the facts necessary to prove a contempt charge are known by the judge, direct contempt is the proper characterization. *Id.* An example of direct contempt is where an attorney flagrantly disobeys an evidentiary ruling concerning the questions allowed to be asked of a witness. See *People v. Graves*, 74 Ill. 2d 279, 281-82 (1979). In this example, the judge observes the allegedly contemptuous conduct firsthand, and he or she does not need external proof to hold the person in contempt. An example of indirect contempt is where an individual violates a court-ordered injunction. See *City of Chicago v. Rago*, 188 Ill. App. 3d 482, 483, 487-88 (1989). In this example, the judge does not observe the allegedly contemptuous conduct firsthand, and he or she must rely on external proof of facts to hold the person in contempt.

¶ 41     Properly identifying whether a contempt charge is direct or indirect is critical because a direct contempt charge may be resolved summarily without formal pleadings, notice, or a

hearing, as the alleged conduct was witnessed firsthand by the judge. *In re Estate of Lee*, 2017 IL App (3d) 150651, ¶ 40. Conversely, when someone is charged with indirect contempt, regardless of whether it is civil or criminal, the alleged contemnor is entitled to certain due process protections, including notice and the opportunity to be heard. *Id.* However, an alleged civil contemnor is entitled only to minimal due process protections whereas an alleged criminal contemnor is entitled to substantial due process protections. *Id.*

¶ 42    Additionally, some decisions in Illinois have carved out a subcategory of direct contempt, sometimes referred to as constructive direct contempt, which involves conduct that occurs in the constructive presence of the court. See *People v. Javaras*, 51 Ill. 2d 296, 299 (1972); *In re Estate of Lee*, 2017 IL App (3d) 150651, ¶ 39. An example of constructive direct contempt is filing a will in probate court known to be spurious. See *In re Marriage of Betts*, 200 Ill. App. 3d at 48. In this example, although the allegedly contemptuous conduct did not occur directly in the presence of the judge, the conduct nevertheless occurred within an integral part of the court. But despite the characterization of this type of conduct as constructive direct contempt, procedurally it is akin to a charge of indirect contempt because the alleged "contemptuous conduct must be established by proof of facts of which the trial judge does not have direct knowledge." *Id.* at 59. Thus, allegations of constructive direct contempt may not be resolved summarily, and the alleged contemnor is entitled to certain due process rights, which depend upon whether the contempt charge is civil or criminal. See *In re Estate of Lee*, 2017 IL App (3d) 150651, ¶ 40.

¶ 43                                    B. The Instant Case

¶ 44    In this case, based on our review of Windy City's petition for indirect criminal contempt against the Milazzos, the two overarching allegations are that (1) they lied in the temporary restraining order by representing that they had not used Windy City's confidential information

from February 14, 2014, through May 16, 2014, because they had, in fact, transferred confidential information from two computers issued to them by Windy City and used the information to operate Signature and (2) they violated the temporary restraining order by continuing to use Windy City's confidential information up to and including the day it filed the petition.

¶ 45    We agree with Windy City that criminal contempt was the proper charge here because it sought to punish the Milazzos for their allegedly past contemptuous conduct, but we disagree that its petition was purely one for indirect criminal contempt. Although Windy City's second allegation is clearly one for indirect criminal contempt because the alleged acts of violating what the temporary restraining order prohibited occurred outside the judge's presence, its first allegation is actually one for constructive direct criminal contempt because the alleged contemptuous conduct—a false representation in a court document—occurred within a constituent part of the court. However, as previously discussed, this identification is merely a distinction without a difference as a constructive direct criminal contempt charge is treated as the functional equivalent of an indirect criminal contempt charge because the alleged conduct must be proven by external facts of which the judge does not have direct knowledge. See *In re Marriage of Betts*, 200 Ill. App. 3d at 59. Thus, our discussion will focus on the procedures applicable to allegations of indirect criminal contempt.

¶ 46    An indirect criminal contempt proceeding is a separate and distinct proceeding from that which underlies the contempt charge. *Levaccare v. Levaccare*, 376 Ill. App. 3d 503, 509 (2007). Although an indirect criminal contempt charge is "prosecuted," the charge may be brought by a litigant's attorney or a court-appointed *amicus curiae* in addition to the State. *Marcisz v. Marcisz*, 65 Ill. 2d 206, 210 (1976). When someone is charged with indirect criminal contempt,

the alleged contemnor is entitled to constitutional protections and procedural rights similar to that of a criminal defendant. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 31. This court has even asserted that the alleged contemnor "is entitled to all of the constitutional protections and procedural rights afforded to other criminal defendants." *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 27. The protections and rights include (1) being charged by a written petition, complaint, or information; (2) being informed of the nature of the charges; (3) personal service; (4) the ability to file an answer; (5) a public trial where he or she has the ability to present evidence, subpoena witnesses, and confront and cross-examine witnesses; (6) the privilege against self-incrimination; (7) the presumption of innocence; and (8) the requirement of proof beyond a reasonable doubt. *Id.*; *In re Marriage of Betts*, 200 Ill. App. 3d at 58. Additionally, the alleged contemnor is entitled to a jury trial if the potential penalty could exceed six months' imprisonment or a $500 fine. *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 59.

¶ 47                                         C. Jurisdiction

¶ 48     With that overview of the law of contempt and the proper characterization of Windy City's petition determined, we briefly address an issue that neither party has raised, our jurisdiction in this appeal, which we have a duty to consider regardless of whether the parties have raised it. *People v. Smith*, 228 Ill. 2d 95, 106 (2008). Because criminal contempt is a criminal matter (see *Totten*, 118 Ill. 2d at 130), this appeal is a criminal appeal. Thus, had Windy City's petition been dismissed on the merits after a trial or, in other words, the Milazzos had been acquitted, Windy City would have no basis for an appeal. See *People v. Kapande*, 23 Ill. 2d 230, 236 (1961) (the prosecution cannot appeal from an acquittal). Although we know of no Illinois decision explicitly holding as much in the context of an acquittal after a criminal

contempt trial, this is the trend in other jurisdictions. See *Overnite Transportation Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005) ("[A]n appeal from an acquittal of criminal contempt is barred."); *Denovchek v. Board of Trumbull County Commissioners*, 520 N.E.2d 1362, 1364 (Ohio 1988) ("Most jurisdictions hold that no right of appeal is available following an acquittal on the merits of a criminal contempt charge."); *Commonwealth v. Maurizio*, 437 A.2d 1195, 1196 (Pa. 1981) (finding that, after a person had been found guilty of indirect criminal contempt and acquitted of direct criminal contempt, the latter a more serious charge in Pennsylvania, the prosecution could not appeal the acquittal).

¶ 49     But obviously Windy City's petition was not dismissed after a trial on the merits. Instead, the circuit court dismissed the petition before a trial based on the Milazzos' motion to dismiss for failing to state an offense brought pursuant to section 114-1(a)(8) of the Criminal Code (725 ILCS 5/114-1(a)(8) (West 2014)), a procedure of which this court has tacitly approved. See *United Transfer, Inc. v. Lorence*, 2011 IL App (2d) 110041, ¶¶ 12, 26. Although the prosecution cannot appeal from an acquittal in a criminal case, it can appeal from the dismissal of a charge based on any of the grounds enumerated in section 114-1 of the Criminal Code (725 ILCS 5/114-1 (West 2014)). Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2017). Because Windy City was the prosecutor in this case and its criminal petition was dismissed for failing to state an offense under section 114-1(a)(8) of the Criminal Code (725 ILCS 5/114-1(a)(8) (West 2014)), we find it may appeal the dismissal, and therefore, we have jurisdiction in this case. See *United Transfer*, 2011 IL App (2d) 110041, ¶¶ 12-27 (addressing the appeal of a petition for indirect criminal contempt that the circuit court dismissed for failing to state an offense).

¶ 50                         D. *Ex Post Facto* Concerns

¶ 51 With the overview of the law of contempt in mind and our jurisdiction settled, we now turn to the specific contentions raised by Windy City, beginning with its argument that the circuit court erred in dismissing the petition based on *ex post facto* concerns. Windy City posits the Milazzos falsely represented in the temporary restraining order that they had not performed certain actions from February 14, 2014, through May 16, 2014, and asserts that a false representation to the court constitutes contempt.

¶ 52 When the circuit court dismissed Windy City's petition based on *ex post facto* concerns, the court found that the petition failed to allege an offense because the temporary restraining order provided *prospective* relief to Windy City in the form of an injunction and the Milazzos could not have willfully violated the order based on conduct occurring prior to the order's entry. In essence, the court ruled as a matter of law that Windy City's allegation about the Milazzos' past conduct could not support a contempt charge.

¶ 53 As mentioned, when the Milazzos moved to dismiss the petition for failing to state an offense, they did so pursuant to section 114-1(a)(8) of the Criminal Code (725 ILCS 5/114-1(a)(8) (West 2014)). Generally, we review the circuit court's ultimate decision to dismiss charges under the abuse-of-discretion standard of review (see *People v. Mattis*, 367 Ill. App. 3d 432, 435 (2006)), but because this is a purely legal question, *i.e.*, whether an allegedly false representation in a temporary restraining order can form the basis for a criminal contempt charge, we review the dismissal *de novo*. See *People v. Stapinski*, 2015 IL 118278, ¶ 35.

¶ 54 Although the circuit court found that, regardless of the veracity of the Milazzos' representation in the temporary restraining order, it was impossible "to enjoin a party retroactively," the court misunderstood the true nature of Windy City's allegation. Windy City was not concerned that the Milazzos' past conduct would have violated what the temporary

restraining order barred prospectively but rather that the Milazzos' representation about their past conduct was untruthful. It is axiomatic that a temporary restraining order acts to bar future conduct and maintain the status quo (see *Delgado v. Board of Election Commissioners*, 224 Ill. 2d 481, 483 (2007)), and to that end, the temporary restraining order entered in this case prohibited the Milazzos from certain actions with regard to Windy City's confidential information. However, merely because the intent of the temporary restraining order was to bar future conduct by the Milazzos does not mean that a constructive direct criminal contempt charge cannot be based on an allegedly false representation about their past conduct also contained in the order.

¶ 55    Indeed, the filing of documents in court containing known falsities has supported contempt findings. In *In re Estate of Melody*, 42 Ill. 2d 451, 453 (1969), our supreme court held a person was properly found to have committed criminal contempt where she concocted a plan to have an attorney file a spurious will in court as such conduct was "clearly designed to obstruct the administration of justice and law." In *People v. Kaeding*, 239 Ill. App. 3d 851, 856 (1993), this court held a person was properly found to have committed criminal contempt where he filed a document in court, asserting that the trial judge was "engaged in an 'evil and wicked' pattern of incarcerating individuals," an " 'axeman' " and was "skimming fines for the court system," as such conduct "was obviously calculated to derogate from the dignity of the court." In *People v. Brown*, 30 Ill. App. 3d 828, 830 (1975), this court held a person was properly found to have committed criminal contempt where he filed a document in court, specifically a postconviction petition, containing false statements. What these cases illustrate is that "[t]he mere filing" in court of "any document containing contemptuous matter is sufficient to constitute" contempt. *People v. Jashunsky*, 51 Ill. 2d 220, 224 (1972).

¶ 56    Suffice it to say that making a knowingly false representation in a temporary restraining order similarly could constitute contempt under the right circumstances. And this is exactly what Windy City alleged the Milazzos had done. Generally, the *ex post facto* doctrine concerns the enactment of laws that retroactively punish conduct and thereby punish conduct that was legal when originally performed. *People v. Cornelius*, 213 Ill. 2d 178, 207 (2004). Obviously, this case does not involve any legislation with a retroactive effect, so the doctrine in its core principle does not apply. What the circuit court was partially concerned about was punishing the Milazzos based on their past conduct without fair notice, which the *ex post facto* doctrine in part exists to protect. See *id.* But Windy City did not seek to punish the Milazzos' conduct without fair warning, but rather sought to punish them for lying in the temporary restraining order. Because of this critical distinction, there were no *ex post facto* concerns in Windy City's allegation, and the allegation could constitute contempt under the appropriate circumstances.

¶ 57    This conclusion has nothing to do with what the evidence at a trial would show concerning the Milazzos' alleged false representation. Although the mere filing of court documents containing known falsities may be calculated to impede or obstruct the court in its administration of justice (*People ex rel. Kunce v. Hogan*, 67 Ill. 2d 55, 60 (1977)), the evidence still must show that the party charged with contempt willfully made the false representation. See *Simac*, 161 Ill. 2d at 307 (before the circuit court can hold a person in criminal court, it "must find that the alleged contemnor's conduct was willful"). And it is quite possible that the Milazzos did not willfully make a false representation. After all, as exhibited during various discussions in the circuit court regarding the operative date of the Milazzos' representation in the temporary restraining order, there was some indication that they believed the operative date of the representation was April 14, 2014, not February 14, 2014. For one, there were the proposed

temporary restraining orders and e-mails between the parties' attorneys, demonstrating that, at least at some point before the entry of the actual temporary restraining order, April 14, 2014, was the operative date. The Milazzos' belief is also corroborated in part by the fact that, in their answers to Windy City's complaint and amended complaint, they admitted that Janet copied data in her Outlook file at Windy City during the morning of February 15, 2014, the day *after* the operative date of the representation in the actual temporary restraining order. This admission supports the notion that they might have truly believed April 14, 2014, was the operative date of their representation, otherwise, their admission might directly contradict their representation.

¶ 58 Furthermore, in Sal's brief, he states that he and Janet had been charged with felony theft for allegedly stealing property of Windy City, which, according to him, required Janet to review Windy City's QuickBooks accounting software with her attorney after February 14, 2014, to defend against the theft charges. Although Sal did not say when after February 14, 2014, this occurred, it is possible it was before May 16, 2014. If so, the Milazzos could have believed that accessing this information had a legitimate purpose and would not have been covered by their representation in the temporary restraining order. However, whether or not these examples demonstrate that the Milazzos did not willfully misrepresent their actions in the temporary restraining order is reserved for a trial on the merits of the evidence, not a dismissal based on the law. Consequently, the circuit court erred in dismissing Windy City's petition as a matter of law based on the temporary restraining order providing only prospective relief.

¶ 59                                E. The Sufficiency of the Petition

¶ 60 Windy City next contends that, to the extent the circuit court dismissed its petition based on a lack of specificity, such a ruling was improper as the petition and bills of particulars gave sufficient notice to the Milazzos of how they allegedly violated the temporary restraining order.

¶ 61    During the first hearing on Windy City's motion to reconsider, the circuit court intimated that it had dismissed the petition based on a lack of "specificity," though it did not explain why the petition lacked the required specificity. While the Milazzos did argue in support of dismissal that the petition and bills of particulars in conjunction were insufficient to inform them of the nature of the charges, the court did not initially dismiss the petition based on a lack of specificity, but rather determined that it did not need to address the issue because of the *ex post facto* concerns.

¶ 62    Although the circuit court did not address this issue when it initially dismissed the petition, we must, as the prosecutor's failure to sufficiently inform the alleged contemnor of the nature of the charges against him renders him unable to properly exercise his due process rights. See *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 59. Because the circuit court did not address the sufficiency of the allegations in the petition, there is no ruling from the court on this issue, meaning our review "is made on a blank slate or *de novo*." *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 104. But regardless, we would review this issue *de novo* because the Milazzos challenged the sufficiency of the allegations in their charging document through a motion to dismiss. *People v. McClenton*, 2017 IL App (3d) 160387, ¶ 34.

¶ 63    In purely criminal proceedings, all defendants have the right to be informed about the nature of the criminal allegations against them. *People v. Meyers*, 158 Ill. 2d 46, 51 (1994). Section 111-3(a) of the Criminal Code (725 ILCS 5/111-3(a) (West 2014)), which mandates what must be included in a charging document, gives substance to this right. *Meyers*, 158 Ill. 2d at 51. Section 111-3(a) provides that the charge must be in writing and allege the commission of an offense by

        "(1) Stating the name of the offense;

(2) Citing the statutory provision alleged to have been violated;

(3) Setting forth the nature and elements of the offense charged;

(4) Stating the date and county of the offense as definitely as can be done; and

(5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty." 725 ILCS 5/111-3(a) (West 2014).

¶ 64    Because a charging instrument is a preliminary pleading, it only must contain a "cursory statement of the facts." *People v. Swartwout*, 311 Ill. App. 3d 250, 256 (2000). But when a criminal "statute encompasses a wide variety of conduct," the charging instrument "must define the nature and elements of the offense in terms that are more specific than the broad and general language of the statute." *People v. Fields*, 339 Ill. App. 3d 689, 696-97 (2003). When reviewing the sufficiency of a charging instrument, the proper inquiry is whether there was "sufficient particularity to enable the accused to prepare a proper defense," not whether the prosecution could have described the alleged offense with more specificity. *Meyers*, 158 Ill. 2d at 54. The focus of this inquiry is the charging instrument itself, regardless of whether the defendant is provided additional information about the allegations through a bill of particulars. *Id.* at 53. The purpose of a bill of particulars is merely to "supplement a *sufficient* indictment with more specificity of detail to enable a defendant to better understand the nature of the charges against him, or to better prepare a defense to the charges." (Emphasis in original.) *Id.* A bill of particulars cannot cure an insufficient charging document. *Id.* Thus, when analyzing a motion to dismiss based on the alleged insufficiency of a charging instrument, we look only at the charging instrument "without regard to the additional specificity supplied by the bill of particulars." *Id.*

¶ 65 The preceding law concerned purely criminal proceedings. Contempt proceedings, as previously discussed, are *sui generis* (*Milton*, 2018 IL App (1st) 171392, ¶ 33), meaning the Criminal Code (725 ILCS 5/100-1 *et seq.* (West 2014)) does not fully apply. *In re Marriage of Betts*, 200 Ill. App. 3d at 48-49. However, also as previously discussed, when a person is charged with indirect criminal contempt, the alleged contemnor must be afforded similar, if not all, constitutional protections and procedural rights afforded to a traditional criminal defendant. See *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 31; *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 27. Two such protections are being charged by a written document and being informed about the nature of the charges. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 31. To accomplish the latter, the alleged contemnor must be informed of the sanctions being sought and have the allegations set forth specifically and definitely. *People v. Waldron*, 114 Ill. 2d 295, 303 (1986); *People v. Covington*, 395 Ill. App. 3d 996, 1007 (2009).

¶ 66 Although no decision from Illinois has expressly adopted the requirements enumerated in section 111-3(a) of the Criminal Code (725 ILCS 5/111-3(a) (West 2014)) as ones needed to be included in petitions for indirect criminal contempt and our supreme court long ago stated that petitions for indirect criminal contempt do not need to have all the formalities of criminal complaints to be sufficient (see *People v. Harrison*, 403 Ill. 320, 328 (1949)), we cannot help but note the similarities between section 111-3(a) and what has been required to be included in petitions for indirect criminal contempt. Compare 725 ILCS 5/111-3(a) (West 2014) (stating a charging document must be in writing and allege the nature and elements of the offense charged) with *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 31 (stating that the alleged contemnor must be charged by a written petition and informed of the nature of the charges). Given these similarities, *Fields*, 339 Ill. App. 3d 689, a case analyzing section 111-3(a) and the

sufficiency of a charging instrument, is instructive in determining whether Windy City's petition was sufficient.

¶ 67    In *Fields*, the defendant was charged with two counts of money laundering. *Id.* at 696. The first count alleged that, on or about April 16, 1999, in Du Page County, he " 'committed the offense of Money Laundering in that said defendant knowingly engaged in a financial transaction in criminally derived property with a value exceeding $10,000.00 and knew that the financial transaction was designed in whole or in part to conceal the source of the criminally derived property in violation' " of section 29B-1 of the Criminal Code of 1961 (720 ILCS 5/29B-1 (West 2000)). *Fields*, 339 Ill. App. 3d at 696. The second count alleged that, on or about August 16, 1999, in Du Page County, he " 'committed the offense of Money Laundering in that said defendant knowingly engaged in a financial transaction in criminally derived property with a value exceeding $10,000.00 and knew that the financial transaction was designed in whole or in part to conceal the source of the criminally derived property in violation' " of section 29B-1 of the Criminal Code of 1961. *Id.* The defendant filed two motions to dismiss the indictment against him, both of which the circuit court denied. *Id.*

¶ 68    The defendant appealed, arguing that the indictment lacked the necessary details to sufficiently inform him of the nature of the offenses. *Id.* at 695. Initially, the appellate court observed that the indictment named the defendant, listed the offense, statutory section allegedly violated, the dates of the occurrences, the county of the occurrences, and recited the elements of the offense by mirroring the statutory language. *Id.* at 696. But the court observed that the money laundering statute prohibited conduct in the "most general terms," noting the statutorily defined words " 'criminally derived property' " and " 'financial transaction' " encompassed a wide array of assets and conduct. *Id.* at 697-98. The statute defined "criminally derived property" as

- 28 -

essentially any property or proceeds, directly or indirectly, derived from a violation of the Criminal Code of 1961 (720 ILCS 5/1-1 *et seq.* (West 2000)), the Illinois Controlled Substances Act (720 ILCS 570/100 (West 2000)), or the Cannabis Control Act (720 ILCS 550/1 *et seq.* (West 2000)), meaning the State's broad reference in the indictment to criminally derived property "left [the] defendant guessing as to whether he allegedly obtained the 'criminally derived property' in violation of the drug statutes, a theft, or some other action that violated the criminal statutes." *Fields*, 339 Ill. App. 3d at 697-98.

¶ 69 Similarly, the money laundering statute defined "financial transaction" as any purchase, loan, sale, gift, pledge, transfer, delivery or other disposition of property. *Id.* at 698. Because the defendant's indictment "did not indicate whether [his] 'financial transaction' was the securing of a loan to pay for the cars, the payment of the down payment, the payment of the monthly installments, or a combination of any or all of those activities," he could only "guess at which action was serving as the basis for money laundering charges against him." *Id.* As a result, "the two key elements of the offense, the 'criminally derived property' and the 'financial transaction,' were defined in broad and conclusory language and did not apprise defendant of the prohibited conduct at issue." *Id.* The court therefore concluded that the indictment was insufficient. *Id.* After making this conclusion, the court rejected the State's argument that, because it had furnished the defendant with a bill of particulars, it had cured any insufficiency in the indictment. *Id.* at 698-99. The court remarked that an insufficient charging instrument cannot be cured by a bill of particulars and accordingly reversed the circuit court's judgment. *Id.* at 699.

¶ 70 As in *Fields*, we find that Windy City's petition failed to set forth the allegations against the Milazzos specifically and definitely and thus, as a whole, failed to sufficiently inform them of the nature of the charges against them. In reviewing the petition, the majority of its allegations

of fact are a recitation of the facts leading up to the circuit court's grant of the temporary restraining order. In that history, there are brief allegations that two laptops of Windy City that the Milazzos retained "revealed use after February 14, 2014" and that Janet e-mailed herself with confidential information on the morning of February 15, 2014. Following that history, Windy City raised the two overarching allegations. First, it highlighted the Milazzos' representation in the temporary restraining and asserted it was false because they "transferred Confidential Information" from Windy City's computers "in violation of" the temporary restraining order and used that information to operate its competing transportation business. Second, Windy City asserted that the Milazzos' actions "continued to be contemptuous" up to and including the date Windy City brought its petition, in that they "continue[d] to use" the confidential information in violation of the temporary restraining order.

¶ 71    Though the petition asserted that Janet e-mailed herself confidential information on the morning of February 15, 2014, that assertion was contained in the part of the petition reciting the facts leading up to the entry of the temporary restraining order. Moreover, when making this assertion, Windy City did not state that she did this using one of the two Windy City computers, on which the overarching allegation of improperly transferring confidential information was based. As such, it was unclear if that assertion was the basis, or part of the bases, for Windy City's allegation that the Milazzos had lied in the temporary restraining order. Additionally, the Milazzos admitted in both answers that Janet copied the data in her Outlook file at Windy City the morning of February 15, 2014. The Milazzos could not expect that an action they admitted to would later form the basis of a contempt charge. Simply, it is unclear how Windy City's assertion about Janet e-mailing herself confidential information on the morning of February 15, 2014, relates to the contempt charge, if at all.

¶ 72    Given that it was unclear how, or if, Janet's actions on the morning of February 15, 2014, related to the contempt charges, the remaining allegations are nothing more than broad, conclusory accusations that the Milazzos lied in, and violated, the temporary restraining order. Notably, and just like in *Fields*, Windy City's allegation that the Milazzos "transferred Confidential Information" is completely vague. "Confidential information" has a defined meaning according to the temporary restraining order and the word "transfer" when used with information can mean several actions, such as printing and keeping the information in hard copy form, e-mailing the information to another e-mail account, uploading the information to a cloud storage service, saving the information on an external storage device, or using a local data transfer to transfer the information from one computer to another. Windy City's petition did not attempt to indicate how the transfer or transfers occurred, and the petition did not allege when the transfer or transfers occurred nor provide any type of description of the confidential information that was transferred. Similarly, Windy City did not explain at all how the Milazzos "made use" of the confidential information in operating Signature. The petition further lacked any indication about how or when the Milazzos "continue[d] to use" of Windy City's confidential information after the temporary restraining order had been entered.

¶ 73    Given this lack of detail, the Milazzos were left to guess as to what conduct by them served as the basis for Windy City's charges that they made a false representation in the temporary restraining order and violated the order itself. Comparable to *Fields*, 339 Ill. App. 3d at 697-99, where the terms "criminally derived property" and "financial transaction" were too vague in an indictment to sufficiently apprise the defendant of the nature of his money laundering charges, Windy City's references to generic words such as "transfer[ ]" and "use" and the term "confidential information," which had been defined by the parties in the temporary

restraining order, were too vague to sufficiently apprise the Milazzos of the nature of their indirect criminal contempt charges. In sum, while the allegations in the petition might have alleged the basic elements of indirect criminal contempt, Windy City did not set forth the allegations specifically and definitely. See *Waldron*, 114 Ill. 2d at 303; *Covington*, 395 Ill. App. 3d at 1007.

¶ 74 Nevertheless, Windy City posits that, in conjunction, its petition and bill of particulars sufficiently apprised the Milazzos of the nature of the charges against them. However, our review is limited only to the charging instrument itself (see *Meyers*, 158 Ill. 2d at 54), and while Windy City provided the Milazzos each with a bill of particulars that set forth in great detail the actions they allegedly performed to violate the temporary restraining order, a comprehensive bill of particulars cannot cure an insufficient charging document. See *id.* In fact, most of the statements in the bills of particulars were based on affidavits from Fazio, the forensic examiner who investigated what confidential information of Windy City's allegedly had been used, disclosed, or accessed by the Milazzos. All of the affidavits were dated in 2014, *before* Windy City filed its petition against the Milazzos. Windy City's detailed bills of particular were not a substitute for their incomplete petition.

¶ 75 Windy City additionally claims in its reply brief that its petition against the Milazzos alleged that they failed to return Windy City's property and information, which it argues also violated the temporary restraining order. For support, Windy City cites to paragraph 13 of its petition, which states that "[t]he actions of [the Milazzos] have continued to be contemptuous until this date, in that [they] continue to use the Confidential Information of Windy City in violation of the [temporary restraining order]." But nowhere in this paragraph did Windy City specifically and definitely allege that the Milazzos failed to return its property and information.

Before paragraph 13, Windy City did state that the Milazzos "retained possession of two laptop computers, one iPad, and two 'smart' phones which held Confidential Information," but Windy City did not allege that their retention of property violated the temporary restraining order.

¶ 76    It is undeniable that, as part of the temporary restraining order, the Milazzos were required to return to Windy City within three days "all information, documents and property" that contained confidential information and "all other property belonging to Windy City, regardless of whether or not such information is Windy City's Confidential Information." But to charge someone with criminal contempt based on retention of property and information in violation of this clause of the temporary restraining order, there needed to be a specific and definite allegation, which Windy City failed to do. See *Waldron*, 114 Ill. 2d at 303; *Covington*, 395 Ill. App. 3d at 1007. We therefore reject Windy City's argument that its petition sufficiently alleged that the Milazzos failed to return Windy City property and information.

¶ 77    We reiterate that, when the circuit court dismissed the petition initially, it did not address the sufficiency of the petition despite that argument being made by the Milazzos in support of their request to have the petition dismissed. However, we may affirm the circuit court's judgment on any basis supported by the record, regardless of whether the court based its judgment on those grounds. See *Pekin Insurance Co. v. Lexington Station, LLC*, 2017 IL App (1st) 163284, ¶ 40; *People v. Brown*, 2015 IL App (1st) 122940, ¶ 45. Accordingly, because we find Windy City's petition lacking in the required specificity to sufficiently inform the Milazzos of the nature of the charges against them, the circuit court properly dismissed the petition for indirect criminal contempt against the Milazzos.

¶ 78                    F. Motion to Reconsider

¶ 79    Windy City also contends that the circuit court erred in denying its motion to reconsider, arguing that the court's two-part justification—initially based on concerns about the issue of entrapment and later on grounds of wanting the parties to focus their attention on the civil litigation—was erroneous.

¶ 80    Motions to reconsider generally do one of three things: (1) bring to the court's attention changes in the law, (2) bring to the court's attention new evidence, or (3) assert the court erred in its application of the existing law. *Papadakis v. Fitness 19 IL 116, LLC*, 2018 IL App (1st) 170388, ¶ 13. In moving the circuit court to reconsider its initial ruling, Windy City argued that the court had erred in its application of the existing law. When a party makes a motion to reconsider based upon alleged errors in the circuit court's application of existing law, that party, in essence, "ask[s] the court to rethink what it already thought." *O'Shield v. Lakeside Bank*, 335 Ill. App. 3d 834, 838 (2002). As such, our review is of the court's original ruling. *Papadakis*, 2018 IL App (1st) 170388, ¶ 13. As we have already determined that the court properly dismissed Windy City's petition, albeit for different reasons, we therefore need not address the court's rulings on the issue of entrapment or wanting the parties to focus their attention on the civil litigation because its ultimate decision to dismiss the petition was proper. Accordingly, because the court's ultimate decision to dismiss Windy City's petition was correct, its ultimate decision to deny Windy City's motion to reconsider was also correct.

¶ 81                                  III. CONCLUSION

¶ 82    For the foregoing reasons, we affirm the judgments of the circuit court of Cook County.

¶ 83    Affirmed.

¶ 84    JUSTICE GORDON, specially concurring:

¶ 85    I agree that the decision of the trial court should be affirmed but I must write separately. I know of no Illinois Supreme Court case that finds that a prosecutor has the standing or the right to appeal a lower court finding dismissing a petition to hold an alleged contemnor in indirect criminal contempt. There is a Second District case that analyzes a case similar to the case at bar, but jurisdiction and standing was not an issue and was never discussed. See *United Transfer, Inc. v. Lorence*, 2011 IL App (2d) 110041. Indirect criminal contempt is the inherent ability of the court to hold a person or legal entity in contempt. I believe that contempt should only be used by the trial court as a last resort when there is no other remedy available. It is within the court's discretion to exercise this inherent right. When the court dismisses a petition and does not want to use that ultimate sanction, I believe there is no right to appeal. Many jurisdictions hold that, if the contemnor is found not guilty of criminal contempt, there is no right to appeal. It would appear that the same rule should apply when the charging document is dismissed.

¶ 86    In the case at bar, I do not believe that the trial court misunderstood the true nature of Windy City's allegation. The trial court may have dismissed the petition initially based on the retroactivity issue, but as the majority ably points out, the prosecutor failed to sufficiently inform the alleged contemnor of the nature of the charges against him. The trial court may have noticed that the remaining allegations of the petition did not adequately provide the alleged contemnor with the ability to figure out the nature of the criminal allegation alleged. As a result, the trial court dismissed the petition on the one obvious ground, the alleged retroactivity.