2021 IL App (1st) 191989-U

No. 1-19-1989

Second Division
February 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| SDC FINANCIAL, LLC, and | ) | Circuit Court of |
| SMILEDIRECTCLUB, LLC, | ) | Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 2019 CH 02955 |
| v. | ) | |
| | ) | |
| ALIGN TECHNOLOGY, INC., | ) | Honorable |
| | ) | Raymond Mitchell |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirmed. The circuit court's denial of a contempt motion is affirmed where the alleged contemnor's proposed additional transfer agreement terms were not in contravention of the arbitration award as confirmed.

¶ 2    Plaintiffs-Appellants, SDC Financial, LLC and SmileDirect Club, LLC (collectively, SDC) appeal from the circuit court's order denying their motion for issuance of a rule to show cause (Contempt Motion) against defendant-appellee, Align Technology, Inc. (Align). On appeal, SDC

argue that their contempt motion should have been granted because Align failed to transfer its membership interests in compliance with a prior arbitration award that was confirmed by the circuit court. For the reasons that follow, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4      SDC sells clear orthodontic aligners directly to consumers and also provides patient management, marketing, and other services to state-licensed dentists and orthodontists. Align manufactures and sells clear aligners to dental offices. On July 25, 2016, Align purchased 17% of SDC, loaned SDC $30 million, and obtained a seat on SDC's board of directors. As part of the transaction, the parties entered into a Second Amended and Restated Operating Agreement (Operating Agreement). Section 7.9 of the Operating Agreement contained restrictive covenants that, among others, barred each member of SDC from engaging in a competing business during the time they are a member and for two years thereafter. Section 7.10 of the Operating Agreement required members to maintain SDC's confidential information and to use such information only for managing their investment. If a member breaches a restrictive covenant, section 9.3 of the Operating Agreement provides that other members shall have the right to purchase all the breaching member's interests for a price equal to the capital account of the breaching member as of the last day of the month preceding the breach plus the interest rate. Finally, section 12.1 of the Operating Agreement provides that the parties agree that "[a]ny claim, controversy, or other dispute among [them] and arising out of or relating to this agreement, its enforcement, or interpretation" is to be submitted to binding arbitration "before a single arbitrator, in Chicago, Illinois."

¶ 5      Prior to the transaction, SDC operated several SmileShops, brick-and-mortar stores intended to familiarize consumers with clear aligners. The SmileShops' business model consisted

of educating consumers about the treatment process, scanning and photographing their teeth, obtaining their medical histories, demonstrating improvements that could be made, and discussing pricing and financing information. If a consumer agreed to proceed, a treatment plan was devised and forwarded to a SDC network provider for review. At the time of the transaction, Align did not have brick-and-mortar stores and marketed to consumers via its website and advertisements. After the transaction, in November 2017, Align opened two Invisalign Scan Shops (Invisalign stores) in the San Francisco and San Jose area, which allegedly mimicked the SmileShops' business model. In response, SDC sent a cease-and-desist letter to Align. The letter provided that Align violated the Operating Agreement's restrictive covenants and therefore, SDC was exercising their right to repurchase Align's membership interest.

¶ 6    On April 2, 2018, SDC commenced arbitration against Align, alleging that Align's Invisalign stores were competing businesses in violation of section 7.9(e) of the parties' Operating Agreement. SDC further alleged that Align breached its fiduciary duty by improperly using SDC's confidential information to design and launch its Invisalign stores. Accordingly, SDC sought, *inter alia*, an order requiring Align to close its stores and tender its membership interest pursuant to the Operating Agreement. Align denied breaching the Operating Agreement or its fiduciary duties, arguing that it conducted its business in the manner contemplated by the parties at the time they entered into the Operating Agreement and never used SDC's confidential information. Align further contended that, even if it had breached the Operating Agreement, SDC was not entitled to any relief.

¶ 7    On March 4, 2019, the arbitrator issued an award (Final Award) in favor of SDC, finding Align in breach of the restrictive covenants as outlined in the Operating Agreement. The final award "permanently enjoined and prohibited" Align from conducting business at the Invisalign

stores and from opening new stores. The award further prohibited Align from providing certain services at its "physical retail establishments" in connection with the marketing and sale of clear aligners. Align was also prohibited from using SDC's confidential information. Lastly, the award stated that "[b]y no later than April 3, 2019, Align shall tender its [m]embership [i]nterests in SDC in exchange for payment from SDC in the amount of Align's capital account as of October 31, 2017, under the terms contained in Sections 9.3(c) and (d) of the Operating Agreement." In the discussion section of the award, the arbitrator noted that "[t]he evidence shows that the value of Align's capital account as of the relevant date was approximately $54 million."[1] On March 5, 2019, SDC filed a petition to confirm the final award in the circuit court.

¶ 8    On April 1, 2019, counsel for SDC sent Align drafts of the purchase agreement and promissory note (Transfer Documents). These documents provided for a purchase price of $54, 153, 849.40 for Align's membership interests. On April 3, 2019, counsel for Align sent a letter to SDC's counsel confirming Align's compliance with the final award. Specifically, Align confirmed that as of April 3, 2019, it had closed all of its existing Invisalign stores and returned or destroyed "substantially all of SDC's 'Confidential Information,' as reasonably identified and defined pursuant to [s]ection 7.10" of the Operating Agreement. Align also noted that it "tendered its [m]embership interests in SDC in a manner consistent with the terms and requirements of the Operating Agreement and Award" by enclosing executed copies of its own transfer documents.

¶ 9    The April 3, 2019 letter highlighted the fact that Align's transfer documents were "in contrast to the [previous] drafts" provided by SDC's counsel. Align's transfer documents included

---

[1] The $54 million valuation of Align's capital account appears to be based on the testimony of an Align representative at the arbitration hearing.

a redemption agreement, which stated that"[s]olely for purposes of implementing the [c]losing by April 3, 2019 as provided by the Final Award, the assumed total consideration to be paid by the Company" for the membership interests was $54, 152, 849.40. The terms of the agreement further provided that by entering into the agreement, SDC acknowledges that the agreement does not preclude members from exercising their valuation rights and amending the agreement. SDC was also not precluded from issuing "a replacement note to implement any increase in the [r]edemption [p]rice."

¶ 10    The letter further conveyed Align's "disappoint[ment]" with SDC's "take it or leave it" approach to the finalization of the documents. Align asserted that "SDC's insistence on proceeding with its drafts of the documentation, and unwillingness to further discuss why certain of the required terms are unacceptable to Align and inconsistent with the requirements of the Operating Agreement and Award, [was] patently unreasonable." The letter listed the reasons for Align's objections to the previous drafts, which included, *inter alia*, (1) "SDC's persistent refusal to calculate the value of Align's Capital Account in the manner prescribed by the Operating Agreement" and the arbitrator's ruling that the capital account must be determined in accordance with the Operating Agreement; (2) SDC's refusal to apply the average of the two interest rates referenced in section 9.3(e) of the Operating Agreement; and (3) "SDC's insistence that each obligor has an unrestricted right to assign its interests, without advance notice to or consent by Align."

¶ 11    On April 29, 2019, the circuit court entered an order confirming the arbitration award in its entirety. On May 13, 2019, SDC filed its contempt motion, arguing that Align failed to comply with the April 29, 2019 order. SDC argued that the basis for the contempt motion was Align's improper conditions in tendering its membership interests, including (1) "allowing Align to attack

collaterally the [c]ourt's and the [a]rbitrator's valuation of its membership interests at $54 million"; (2) requesting a different rate than that set forth in the Operating Agreement; and (3) demanding restrictions on assignment of the promissory note not found in the Operating Agreement. "Because Align *** refused to sign the documentation to transfer its membership interests without these terms, in contravention of the [f]inal [a]ward and the [c]ourt [o]rder," SDC argued that Align should be held in indirect civil contempt. In response, Align filed a cross-motion to dismiss SDC's contempt motion or in the alternative stay pending arbitration. On July 9, 2019, Align filed a notice informing the court that it initiated a second arbitration.

¶ 12    On September 4, 2019, the circuit court denied SDC's contempt motion. The court noted that there was no dispute that the final award ordered Align to "tender its membership interests in SDC in exchange for payment from SDC in the amount of Align's capital account as of October 31, 2017, under the terms contained in [s]ections 9.3(c) and (d) of the Operating Agreement." Rather, the dispute pertained to "whether the factual findings made by the arbitrator bind the valuation of the capital account for the purpose of executing the membership transfer." Although SDC argued that the final award includes the monetary value of Align's capital account, Align asserted that the valuation dispute was not determined by the final arbitration award confirmed by the court. The court agreed with Align, finding that the "valuation dispute forming the basis of [SDC's] contempt petition arose weeks after the final arbitration decision and involve[d] a post-arbitration dispute, rather than the enforcement of the award's stated relief." In other words, the court found that the contempt motion required a determination of the purchase price of the redemption, an issue being litigated in a new arbitration filed by Align.  As such, the court ruled that the "ongoing dispute [did] not support a willful violation of a court order as required to invoke the [c]ourt's contempt powers." SDC now appeals from that decision.

¶ 13                                        II. ANALYSIS

¶ 14     On appeal, SDC requests that this court reverse the circuit court's denial of their contempt motion and hold Align in indirect civil contempt. SDC contends that the circuit court improperly framed the issue as whether the parties are bound by the arbitrator's factual findings regarding the value of Align's capital account for purposes of executing the membership transfer. According to SDC, the main issue is instead whether Align is improperly conditioning its compliance with the membership transfer on SDC's affirmative agreement to additional contractual terms. Specifically, SDC contends that Align is improperly (1) reserving the right to file a second arbitration to contest the valuation of the stated capital account it presented at the first arbitration; (2) imposing an interest rate for the promissory note different from the interest rates set forth in the Operating Agreement; and (3) restricting SDC's members' rights of repurchase and of assignment. SDC contends that because nothing in the final order or the Operating Agreement allowed Align to condition its compliance, Align should be held in contempt.

¶ 15                                        A. Jurisdiction

¶ 16     As an initial matter, we must address our jurisdiction over the instant appeal. Align argues that SDC's appeal is moot because Align has "fully tendered its membership interests" and "SDC has made payment in the amounts and on the terms SDC demanded." Align further contends that any asserted malfeasance by Align occurred prior to the entry of the circuit court's confirmation order and therefore, it could not have acted in contempt of an order that was not yet entered. In response, SDC argues that Align acted in contempt when it failed to sign SDC's transfer documents or withdraw all objections to SDC's redemption. SDC argues that it obtained "a clear and unambiguous arbitration award" that required Align to tender, by a certain date, its memberships interests in SDC as set forth by section 9.3 of the Operating Agreement. SDC maintains that it is

"entitled to have that award enforced to the letter and to have the certainty of signed [t]ransfer [d]ocuments confirming the redemption."

¶ 17    Generally, an appeal is considered moot when "no actual controversy exists or when events have occurred that make it impossible for the reviewing court to render effectual relief." *Commonwealth Edison Co. v. Illinois Commerce Commission*, 2016 IL 118129, ¶ 9. "Mootness, as a doctrine, stems from the concern that parties to a resolved dispute lack a sufficient personal stake in the outcome to assure that there is an adversarial relationship that sharpens the presentation of issues upon which the courts largely depend for illumination of difficult questions." *Fisch v. Loews Cineplex Theatres, Inc.*, 365 Ill. App. 3d 537 (2005). An action is dismissed as moot when the plaintiff has secured what was originally sought. *Id.* at 539-40. Claims of mootness present questions of law, which we review *de novo. People v. Custer*, 2019 IL 123339, ¶ 17.

¶ 18    Here, the main dispute pertains to whether Align tendered its membership interests in compliance with the final award. Although Align maintains that it tendered its interests pursuant to the final award and the Operating Agreement, SDC contends that Align's execution of its own transfer documents did not comply with the final award as it included language conditioning the transfer. As such, an actual controversy exists as to the terms of the final award and whether Align complied with such terms. Additionally, SDC did not secure what they originally sought, which was a transfer of the membership interests at a determined valuation, not subject to future arbitration or litigation. A live controversy is presented where Align has maintained its rights to challenge the valuation in the future and therefore, the appeal is not moot. See *Cohan v. Citicorp*, 266 Ill. App, 3d at 630 (finding an issue was not moot where defendant banks agreed to waive service fees but "maintain[ed] the right to assess the very same charge" in the future).

¶ 19    The issue of whether Align could be held in contempt is also not moot. Assuming, *arguendo*, that the court found the asserted malfeasance to have occurred, Align had the ability to purge the contempt. See *In re Marriage of O'Malley ex rel. Godfrey*, 2016 IL App (1st) 15118, ¶ 26 (holding that "contempt based on past actions which cannot be undone means that the contemnor lacks the ability to purge the contempt and ""[a] person held in civil contempt must have the ability to purge the contempt by complying with the court order."). In the present case, Align maintained its stance with respect to executing its own transfer documents on the same terms. Align could have purged any asserted malfeasance by either adopting SDC's documents or amending its own transfer documents after the circuit court confirmed the final award. As such, Align had the ability to "undo" its actions and purge the alleged contempt.

¶ 20                                    B. Standard of Review

¶ 21    Having found that this court has jurisdiction, we next consider the standard of review governing contempt. "Contempt of court has been defined as 'conduct that is calculated to impede, embarrass, or obstruct the court in its administration of justice or derogate from the court's authority or dignity, or to bring the administration of the law into disrepute.' " *Windy City Limousine Company, LLC v. Milazzo*, 2018 IL App (1st) 162827, ¶ 35 (quoting *People v. Geiger*, 2012 IL 113181, ¶ 26). "Courts have the inherent authority to reprimand contemptuous conduct because 'such power is essential to the maintenance of their authority and the administration of judicial powers.' " *Id.* (quoting *People v. Simac*, 161 Ill. 2d 297, 305 (1994)).

¶ 22    Contempt may either be criminal or civil and direct or indirect. *In re Estate of Lee,* 2017 IL App (3d) 150651, ¶ 39. "Civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Indirect contempt refers to conduct that occurs outside

the presence of the trial court. *Id.* "The existence of an order of the trial court and proof of willful disobedience of that order are essential to any finding of indirect civil contempt." *Id.* "Whether a party is guilty of indirect civil contempt is a question for the trial court," and we will not disturb its ruling unless it is "against the manifest weight of the evidence or the record reflects an abuse of discretion." *Id.* at 108.

¶ 23                                    C. Reservation of Rights

¶ 24     SDC argues that Align's attempt to reserve its right to pursue a second arbitration with regard to the value of its capital account violates the circuit court's order confirming the final arbitration award in its entirety. SDC contends that the issue it "raised in the contempt motion was whether Align could require SDC to agree to [the] reservation of rights in the [t]ransfer [d]ocuments" and "not whether the $54.1 million purchase was the appropriate purchase price." SDC maintains that the "circuit court never needed to address the appropriate purchase price, because the purchase price term remained the same in both Align's and SDC's drafts of the [t]ransfer [d]ocuments." We disagree.

¶ 25     Although SDC's and Align's documents included the same purchase price of approximately $54 million, Align's redemption agreement specified this purchase price "[s]olely for purposes of implementing the [c]losing by April 3, 2019 as provided by the [f]inal [a]ward." Align's agreement proposed that by entering into the agreement, members were not precluded from exercising their valuation rights and SDC was not precluded from issuing a replacement note to implement any increase in redemption price. As such, the price was subject to dispute and the circuit court correctly framed the issue as whether Align could reserve its right to pursue a second arbitration with regard to the value of its capital account.

¶ 26    We further note that section C of the award simply provided that Align "shall tender its membership interests in SDC in exchange for payment from SDC in the amount of Align's capital account as of October 31, 2017, under the terms contained in Sections 9.3(c) and (d) of the Operating Agreements." Section C also provided that "this award is in full settlement of all claims submitted to this arbitration. All claims not expressly granted herein are denied." Neither section C nor any other provision of the award stated relief specified the value of Align's capital account as of October 31, 2017. Although the arbitrator considered the value of Align's capital account in its discussion, it was in response to Align's argument that forced redemption of its membership interests would result in impermissible forfeiture. The arbitrator considered the approximate value of the capital account as of the relevant date and Align's substantially higher asserted market value in rejecting Align's forfeiture defense. Thus, Align's valuation challenges violate no part of the final award or the circuit court's order confirming the award. As there was no willful violation of the court's order, a finding of contempt is unwarranted.

¶ 27                              D. Interest Rate & Assignability

¶ 28    SDC further seeks a determination that Align's proposed interest rate and limitations to the assignability of the membership interests violate the Operating Agreement. With respect to the interest rate, SDC argues that the issue is straightforward as section 9.3(e) clearly provides that the "price for the Membership Interest purchased *** shall be paid in 24 equal monthly installments with interest at the applicable federal rate" as published in the Internal Revenue Bulletin (IRB). SDC contends that its promissory note contained this IRB rate. With respect to assignability, SDC argues that although "[s]ection 9.3(e) provides that the promissory note must contain certain terms-such as prepayment at any time without penalty," it "does not provide any restrictions on assignment of the note."

¶ 29    Align, on the other hand, contends that neither the Award nor the Operating Agreement provide specific guidance as to either issue. Align argues that section 9.3(e) of the Operating Agreement ambiguously provides that interest shall be calculated based on the applicable federal rate published in the IRB, but also later includes language that it should be calculated at the effective prime rate published in the Wall Street Journal. As such, Align contends that it was proper for it to propose an average of the two interest rates. With respect to assignability, Align proposed, that SDC's ability to assign the note be subject to Align's prior approval, which could not be unreasonably withheld.

¶ 30    We note that the final award did not consider the applicable interest rate, nor did it address limitations to future assignments. Although SDC maintains that the application of the Operating Agreement to these issues is straightforward, our interpretation of the Operating Agreement would run contrary to the arbitration language in the Operating Agreement which limits our role and provides that "any claim, controversy, or other dispute among the parties and arising out of or relating to this agreement, its enforcement, or interpretation" is to be submitted to binding arbitration. Accordingly, the arbitration is the proper forum for these issues.

¶ 31                                III. CONCLUSION

¶ 32    For the reasons stated, we affirm the judgment of the circuit court.

¶ 33    Affirmed.